363 So.2d 1375 (1978)
STATE of Louisiana
v.
Richard CURTIS.
No. 61877.
Supreme Court of Louisiana.
October 9, 1978.
Rehearing Denied November 9, 1978.
*1376 John Wilson Reed, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
CALOGERO, Justice.
On February 21, 1975 Victor Graziano was preparing to open his regular Friday check-cashing business in the rear of Trump's Service Station at the intersection of S. Claiborne Avenue and Toledano Street in New Orleans. He had arrived at the business in his automobile with $8,000.00 in cash and various supplies. He was met there by Jacob Harris, a part-time security guard. Graziano and Harris were in the process of unloading the automobile and entering the building when they were approached by two black males, one armed with a pistol, who indicated that it was a holdup. Harris, startled, dropped the box he was carrying; in an apparent response, the robber with the gun shot Graziano in the hand. The robbers then relieved Harris of his sidearm, grabbed the moneybag containing the $8,000.00, and ran off. During the robbers' flight there was an exchange of gunfire between them and Graziano. The investigating officers, attempting to trace the path of the robbers' flight, found the gun used by the robbers, the gun taken from Harris, small droplets of blood on the sidewalk and a witness who had seen two black men jump into a car driven by a third person. The witness had recorded the license plate number and the car was subsequently discovered parked some distance away with blood stains on the seat and door.
In separate bills of information, allotted to separate sections of the Criminal District Court, the appellant Richard Curtis and one Charles Jackson were charged with this armed robbery. The cases proceeded independently and Charles Jackson was tried and convicted in November, 1975. His conviction has been affirmed in this Court, State v. Jackson, 347 So.2d 172 (La.1977). The appellant Richard Curtis was tried by jury on April 6, 1976 and found guilty as charged. He was sentenced as a multiple offender to serve one hundred ninety-eight years at hard labor in the custody of the Louisiana Department of Corrections without diminution of sentence for good behavior. Before this Court, defendant relies upon five assignments of error for reversal of his conviction and sentence. The remainder of defendant's assignments, not being briefed, are considered abandoned.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error defendant asserts that the court erred in denying defendant's *1377 written motion to suppress identifications. That motion sought to suppress in-court identifications and all pretrial photographic, lineup, show-up and other identifications of the defendant on the grounds that the identification procedures were suggestive, that the pre-trial identifications were unnecessary and impermissible devices to avoid the lineup requirement of counsel mandated by Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and that the pre-trial identifications are of such doubtful reliability that their admission into evidence would be so prejudicial to the defendant as to deny due process.
The day following the robbery Mr. Graziano, who was hospitalized with a gunshot wound of the hand and wrist, selected defendant Richard Curtis' photograph from a group of pictures shown him by the police, and, without suggestion or prompting of any kind, positively identified Curtis as the robber who had shot him in the hand and disarmed Harris. Graziano was not able to identify Charles Jackson because he had not seen Jackson's face at the time of the crime, and only caught sight of Jackson's back as the latter lifted the bag of money out of the car. Also, at the police lineup held on March 20, a month after the commission of the crime, Graziano identified Richard Curtis.
The police displayed a group of photographs to Jacob Harris on February 25, four days after the armed robbery, and Harris identified the pictures of both Richard Curtis and Charles Jackson as the perpetrators of the instant crime. However, because of illness, Jacob Harris was not able to attend the police lineup on March 20. (Tr. 92 et seq.)
In brief defendant's attacks with respect to identification deficiencies are leveled at the rulings relative to the identifications and testimony of Jacob Harris. Appellant relies on the fact that according to Harris' testimony, Harris was told by the police officers who brought him some photographs four days after the commission of the crime, "We think we got them two guys," which was suggestive, according to appellant, and on the further fact that at a June 4, 1975 police lineup in which Charles Jackson was displayed but Richard Curtis was not Harris identified one Irvin Windham rather than Jackson as one of the armed robbers, and later at Jackson's trial identified one Joseph Duncan as one of the robbers.
First of all we find no support in the record for the contention that any pre-trial identification was designed to avoid lineup requirements of counsel mandated by Gilbert v. California. See State v. Wallace, 285 So.2d 796 (La.1973). Harris' exposure to the photographic lineup occurred four days post robbery and before defendant had been arrested. When the police lineup was conducted and the defendant was identified by Graziano, Harris was unable because of illness to attend. The defense contention that the pre-trial identifications by Harris were so unreliable as to deny defendant due process is likewise without merit. The quality of Harris' testimony was for the jury to assess.
Defendant's chief reliance is upon Harris' testimony that at that first photographic lineup the police officers told him "We think we got them two guys."
First of all we are more impressed with and inclined to believe to be more accurate in this case the testimony of the police officers that no such suggestive statement was made to Harris by them. Even assuming, however, the accuracy of Harris' testimony, under our jurisprudence there is no merit to the contention. In State v. Knight, 323 So.2d 765 (La.1975) we held that the statement of police officers at the time of identification that they have a suspect does not justify a conclusion that the procedure used was impermissibly suggestive, as common sense would warrant the victim of the crime in believing as much.
Furthermore, there was an independent source for Harris' in-court identification of Richard Curtis in that Harris was able to get a good, unobstructed look at Curtis during the course of the armed robbery, which occurred in full daylight (around *1378 11:15 a. m.) at close quarters, Curtis' face not being covered or disguised in any fashion.
Assignment of error number one is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant complains of the court's restricting defendant's voir dire by disallowing inquiry of a prospective juror, who had been a recent victim of an armed robbery, into whether she had also given testimony concerning that armed robbery and concerning identification.
Defense counsel was permitted to determine that the witness in question had been a victim of an armed robbery about one year prior to being called for jury duty in the present case and that she did not believe that having been a victim of an armed robbery would influence her in the present case.
Defense counsel did not before or after the court's ruling apprise the court of the purpose of the only partially stated and disallowed question which he contends concerned itself with the juror's prior involvement in a trial involving identification issues.
There is no merit to this assignment.

ASSIGNMENT OF ERROR NO. 3
Defendant here contends that the trial court erred in interfering with and restricting the defense cross examination of Jacob Harris in such a way as to adopt the prosecution's thesis that the witness' multiple misidentifications were unimportant to the present case.
Specifically he says that he should not have been shut off when he attempted to cross examine Harris about his prior identifications of two persons as the perpetrators of the armed robberyCharles Jackson by an in-court identification and Joseph Duncan by a photographic identification. The court erred in shutting off cross-examination of Harris concerning prior mistaken identifications of persons purportedly the robbers, the court's reason being that those mistakes had taken place in the earlier trial of defendant's co-perpetrator Jackson. The complaint is well taken. Effort to show the witness' earlier mistakes as to persons whom he thought were the robbers should have been permitted. However, we do not consider this trial error of sufficient magnitude to warrant reversal of the conviction in light of the fact that independently of this particular effort at cross-examination defendant was permitted to and did establish the point counsel was trying to develop in the disallowed cross-examination. The testimony of Sergeant Orin Mills that Jacob Harris had positively identified Irvin Windham, a fill-in at a June 4, 1975 lineup, established that Harris had made at least one prior mistaken identification. Additionally defense counsel was allowed to read from the transcript of Charles Jackson's trial portions of Harris' testimony in which he identified Joseph Duncan from a photograph as one of the individuals who perpetrated the robbery.
There is no merit to this assignment.

ASSIGNMENT OF ERROR NO. 12
Defendant received as a second offender convicted of armed robbery a sentence of one hundred ninety-eight years at hard labor without entitlement of diminution of sentence for good behavior. He contends that the sentence is illegal because cruel, excessive and unusual under Article I, Section 20 of the Louisiana Constitution of 1974. The contention is without merit. See, State v. Cobbs, 350 So.2d 168 (La.1977); State v. Harvey, 329 So.2d 731 (La.1976); State v. Walker, 328 So.2d 87 (La.1976).

ASSIGNMENT OF ERROR NO. 11
In this assignment defendant complains that assuming his sentence of one hundred ninety-eight years is otherwise valid it should not have been without benefit of diminution of sentence for good behavior.
He contends that the statute employed to deny him the opportunity to earn diminution for good behavior was passed by the *1379 legislature after commission of the crime for which sentenced and that application of the statute to him constitutes an ex post facto application prohibited by both the United States and Louisiana Constitutions.
The armed robbery took place February 21, 1975. As of that date persons sentenced on an armed robbery conviction and other felonies, whether first or multiple offender, were afforded the benefit of diminution for good behavior in the discretion of the director of corrections under the provisions of R.S. 15:571.3(B).
In 1975 the legislature amended R.S. 15:571.3 to provide in subsection C that a person sentenced as a multiple offender after September 15, 1975 could, on order of the court, be denied benefit of diminution of sentence for good behavior.[1] Defendant was convicted in April, 1976 and was sentenced in May, 1976. After the trial judge sentenced defendant to one hundred ninety-eight years, the state moved the court to order that the defendant be denied the benefit of diminution of his sentence for good behavior. The trial judge granted the motion and attached to defendant's sentence the condition that it would be without benefit of diminution for good behavior.
Very recently this Court had occasion to review a contention similar to that put forth here but as it related to application of the 1977 statute (see footnote one above) which mandated the denial of good time diminution. In State v. Wilson, 360 So.2d 166 (La.1978) we held that applying that 1977 act to a defendant whose offense had been committed prior to its enactment but whose sentence was imposed after the effective date of the law was not an unconstitutional ex post facto application of the law.
The distinction between Wilson and the case under consideration is without a significant difference.[2] The premise in the Wilson opinion was that the statute mandating denial of good time opportunity did "not deprive the class of defendants within its coverage of any vested right to good time." While that of course is true, our opinion failed to recognize that the retrospective change is not in any right to earned good time but in the right to be eligible to earn good time, that is, the right of the inmate to try to earn a reduction of his sentence.
That the law has been changed to the defendant's disadvantage, after commission of the crime, is unquestioned. The pertinent inquiry is whether this type of change, of substantial consequence,[3] is the type of retroactive law which is banned by the ex post facto clause.
*1380 The language of the United States and Louisiana Constitutions is quite brief. Article I, Section 9 of the United States Constitution provides:
No bill of attainder or ex post facto law shall be passed.
Article I, Section 23 of the Louisiana Constitution of 1974 similarly provides:
No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted.
In the first United States Supreme Court discussion of the ex post facto prohibition, Justice Chase concluded that the clause proscribes, among other types of laws, "every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). In subsequent cases, it has been stated that an ex post facto law is one that "renders an act punishable in a manner it was not punishable when committed." Fletcher v. Peck, 10 U.S. (6 Cranch.) 87, 138, 3 L.Ed. 162 (1810). See Garner v. Board of Public Works, 341 U.S. 716, 735, 71 S.Ct. 909, 95 L.Ed. 1317 (1951). Employing these and similar definitions, courts have held that the clause prohibits legislatures from retroactively increasing punishment for past criminal acts. Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937).
A major principle underlying the ex post facto proscription is that laws which adversely affect individuals who have committed particular past acts fail to provide a fair warning of the extent to which that person can be punished; furthermore, retroactive legislation frustrates reliance upon existing law and does not serve an object of the criminal law by providing guidance for conduct. By proscribing retroactive criminal legislation, Calder and the federal jurisprudence which followed have limited the ends for which the legislature may use the criminal law: the legislature may not punish when no law has been violated and may not use the criminal law for retribution except with prospective application. See generally, 73 Michigan Law Review 1491 (1975).
In applying the ex post facto prohibitions the courts have struck down as unlawful increases in punishment, retroactive changes in the post conviction treatment of individuals. In In re Medley, 134 U.S. 160, 10 S.Ct. 384, 387, 33 L.Ed. 835 (1890) a statute passed subsequent to the offense required that while awaiting execution a defendant remain in solitary confinement in the state penitentiary; the law applicable at the time of the offense provided that while awaiting execution a defendant should simply be confined in the county prison. With execution of the defendant about to take place the United States Supreme Court nevertheless took the occasion to declare unconstitutional, as an ex post facto law, the requirement that the defendant await his death in solitary confinement in the state penitentiary rather than in the county prison. Said the court, in passing,
". . . it may be said that any law which was passed after the commission of the offense for which the party is being tried is an ex post facto law when it inflicts a greater punishment than the law annexed to the crime at the time it was committed, or which alters the situation of the accused to his disadvantage." (emphasis added)
In a more recent case, Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), the United States Supreme Court invalidated a Washington statute as ex post facto legislation which had the effect of making defendant's punishment more severe because of its effect on the sentence he would serve. The law in effect at the time of his offense provided a penalty of not less than six months and not more than fifteen years. The statute was amended after the offense to require the court to impose a fifteen year sentence, with the parole board having the obligation to set a determinate sentence of no less than six months and no more than fifteen years. The Washington State Supreme Court upheld the statute finding that because the maximum and minimum sentences before and after the offense were the same, the statute did not inflict a greater *1381 punishment. Disagreeing with that approach, the United States Supreme Court observed:
"The effect of the new statute is to make mandatory what was before only the maximum sentence. Under it the prisoners may be held to confinement during the entire fifteen-year period. Even if they are admitted to parole, to which they become eligible after the expiration of the terms fixed by the board, they remain subject to its surveillance and the parole may, until the expiration of the fifteen years, be revoked at the discretion of the board or cancelled at the will of the governor. It is true that petitioners might have been sentenced to fifteen years under the old statute. But the ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. The Constitution forbids the application of any punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. Kring v. Missouri, supra [107 U.S. 221], 228-229, 2 S.Ct. 443, 27 L.Ed. 506; In re Medley, 134 U.S. 160, 171, 10 S.Ct. 384, 33 L.Ed. 835; Thompson v. Utah, 170 U.S. 343, 351, 18 S.Ct. 620, 42 L.Ed. 1061. It is for this reason that an increase in the possible penalty is ex post facto, Calder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648; Cummings v. Missouri, supra [4 Wall. 277], 326, 18 L.Ed. 356; Malloy v. South California, 237 U.S. 180, 184, 35 S.Ct. 507, 59 L.Ed. 905, regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier, State v. Callahan, 109 La. 946, 33 So. 931; State v. Smith, 56 Or. 21, 107 P. 980.
Removal of the possibility of a sentence of less than fifteen years, at the end of which petitioners would be freed from further confinement and the tutelage of a parole revocable at will, operates to their detriment in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old. It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change. Marion v. State, 16 Neb. 349, 20 N.W. 289. Yet this is only a more striking instance of the detriment which ensues from the revision of a statute providing for a maximum and minimum punishment by making the maximum compulsory. We need not inquire whether this is technically an increase in the punishment annexed to the crime, See Calder v. Bull, supra, 3 Dall. 390. It is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the 15-year term." (emphasis added)
Changes in the availability of parole (In re Griffin, 63 Cal.2d 757, 48 Cal.Rptr. 183, 408 P.2d 959 (1965)), and restrictions on the availability of bail on appeal (Greene v. State, 238 So.2d 296 (Fla.1970)) have run afoul of the ex post facto prohibition. And more directly pertinent, laws effecting retroactive changes in availability of good time benefits have also been found in violation of the ex post facto prohibition. State ex rel. Nelson v. Ellsworth, 142 Mont. 14, 380 P.2d 886 (1963).[4]
In the jurisprudence of this state until the recent Wilson decision there had been no case directly concerning the ex post facto law proscription and retroactive laws relative to good time (eligibility for diminution of sentence). There have, however, been analogous cases treating retroactive laws concerning eligibility for parole or probation.
In State ex rel. Woodward v. Board of Parole, 155 La. 699, 99 So. 534 (1924), a defendant, sentenced to life imprisonment under a statute which provided for eligibility for parole, petitioned for relief when a *1382 subsequently enacted statute eliminated the eligibility for parole. Relying on In re Medley, supra, this Court found the denial of parole eligibility unconstitutional:
"There can be no doubt but that the right to be considered for a parole, after the expiration of one-third of the actual time required to be served, with the benefit of commutation under other laws (in his case something in excess of three years), was a substantial one; for otherwise he would be compelled to continue at hard labor under the rules of the penitentiary just three times as long as would have been the case, had the board seen fit, after the expiration of the limit fixed by the Act of 1914, to grant him a parole. There can be no comparison between such a condition, and the right to go at liberty and pursue a livelihood under the restrictions of a parole. Of course, the right was not absolute or fixed in the sense that he was bound to be paroled; but the privilege of having his case submitted to the discretion of the board at the proper time did exist; whereas, now, it is entirely taken away, and the board cannot even consider it under the present law.
It would seem clear, therefore, that to give the Laws of 1916 a retrospective effect would operate seriously to his disadvantage, in violation of the inhibition of the Constitution against ex post facto laws."
And in State v. Bullock, 263 La. 946, 269 So.2d 824 (1972), the state attempted to apply a statute that allowed a jury to impose a life sentence without benefit of parole, probation, commutation or suspension of the sentence. At the time of defendant's offense, there was no provision allowing the jury to attach those conditions to the sentence. Finding this to be an ex post facto application of the law, this Court stated:
"Under long established principle, the prohibition against ex post facto laws includes not only those laws which make acts criminal though done before the enactment made them unlawful, but also it prohibits the enforcement of any enactment which changes the punishment so as to inflict a greater punishment than that authorized for the crime when committed. See: Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), and the similar interpretation uniformly given by later jurisprudence; 1 Antieau, Modern Constitutional Law § 5:133 (1969). `The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.' Lindsey v. State of Washington, 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937).
Thus, this court has held that a subsequent enactment which abolished a prior right of parole was null as an ex post facto enactment insofar as applied to persons convicted for offenses committed prior to it. State ex rel. Woodward v. Board of Parole, 155 La. 699, 99 So. 534 (1924). See also, e. g., Lindsey v. State of Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1934) and In Re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890).
If this same prosecution for a 1966 offense had been remanded or retried prior to enactment of the 1972 act, the defendant had available, if he received a life sentence, the same right to apply for commutation or parole then applicable to all life sentences. The ex post facto prohibitions of our state and federal constitutions forbid applying the 1972 act to offenses committed prior thereto so as to permit the imposition of life sentences subject to more stringent conditions. Thus, in Lindsey v. State of Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), the United States Supreme Court invalidated a state statute, as ex post facto legislation, which had the effect of making the standard of punishment `more onerous', 301 U.S. 400, 57 S.Ct. 798, through its effect on, inter alia, parole and release eligibility."
There is no analytical distinction between eligibility for parole (and analogously probation) and eligibility for diminution of sentence through good time. In neither situation is there a vested right. Indeed at the time of commission of the offense in each situation the law simply provides opportunity *1383 for an accused later convicted that during the course of serving his sentence he will be able to try to earn early release from confinement. In each case "release eligibility" (a phrase used in Lindsey v. Washington, supra and quoted in State v. Bullock, supra) is significantly affected. These are not "minor changes in the handling of prisoners," measures which should not automatically trigger application of the ex post facto laws. See 73 Michigan Law Review, 1503.
We therefore conclude that our recent Wilson decision is incorrect and must be overruled. That the change in the law affecting the opportunity to earn a diminished sentence did not deprive a defendant of any vested right to good time does not alter the fact that the statute applies a new punitive measure to a crime already consummated to the detriment or material disadvantage of the wrongdoer (see Lindsey) and that it has the effect of making the standard of punishment "more onerous" through its effect on release eligibility (see Bullock).
Accordingly, applying R.S. 15:541.3(C) in the sentencing of defendant Curtis after, but for a crime committed before, its effective date, violates the ex post facto clauses of the United States and Louisiana Constitutions. The sentence insofar as it is without benefit of diminution of sentence for good behavior is illegal. The case will therefore be remanded to the trial court for a resentencing.

Decree
For the foregoing reasons, the conviction of defendant Curtis is affirmed. The case is remanded to the trial court for resentencing in accordance with law and the opinion of this Court.
JUDGMENT AFFIRMED; CASE REMANDED FOR RESENTENCING.
SANDERS, C. J., dissents adhering to the holding of State v. Wilson, La., 360 So.2d 166 (1978).
MARCUS, J., concurs in part and dissents in part and assigns reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of defendant's conviction. I dissent from the reversal of his sentence and remand for resentencing for reasons set forth in State v. Wilson, 360 So.2d 166 (La.1978).
NOTES
[1] That provision, added by Acts 1975, No. 727, § 1, is now embodied in R.S. 15:571.3(C)(1), with the amendment that it applies only prior to September 9, 1977. In the summer of 1977, the Legislature added yet another provision R.S. 15:571.3(C)(2) providing that multiple offenders sentenced after September 9, 1977 shall in no case be entitled to time off for good behavior. By the terms of the original enactment, R.S. 15:571.3(C), now (C)(1), was applicable only to persons convicted under the multiple offender law after September 15, 1975. Acts 1975, No. 727, § 3.
[2] Wilson under the 1975 law, at time of commission, could have, on motion of the state been sentenced without benefit of good time diminution opportunity; no such motion was filed, the judge thus did not deny the opportunity, in his discretion, under the pre-1977 law. Defendant would have been eligible (absent trial judge's contrary determination) for grant of good time in the discretion of the penitentiary officials except that the 1977 law in effect at time of sentencing mandated no good time. It was for this reason the judge sentenced him without benefit of good time diminution. Defendant Curtis, on the other hand, under the law at time of commission of his offense was unconditionally entitled to the benefit of discretionary good time. But having been sentenced after the 1975 law went into effect by a trial judge who granted the state's motion to deny him good time, he suffers the same fate as Wilson in that he is denied the opportunity to earn diminution while imprisoned. In both cases, Wilson and Curtis, there has been a denial of the opportunity to earn good time diminution by the application of laws passed after the dates the respective crimes were committed.
[3] Absent the trial court's denying opportunity for diminution on motion of the state, the law would permit a maximum credit of good time of approximately forty-five percent, "twenty-five days per month for time actually served." R.S. 15:571.4(B)
[4] But see Singleton v. Shafer, 313 F.Supp. 1094 (E.D.Pa.1970), a brief United States District Court decision, not appealed, that reached a contrary result.