463 So.2d 1304 (1985)
STATE ex rel. Arthur TURNER
v.
Ross MAGGIO, Jr., Warden, Louisiana State Penitentiary.
No. 84-KD-1283.
Supreme Court of Louisiana.
February 26, 1985.
Rehearing Denied March 21, 1985.
*1305 Katherine Wheeler, Baton Rouge, for respondent.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ronald Martin, Dist. Atty., Ronald E. Corkern, Jr., Asst. Dist. Atty., for relator.
LEMMON, Justice.
This is the latest in a series of cases involving a postconviction application in which a prisoner, who had entered a guilty plea and been sentenced to life imprisonment prior to the repeal of La.R.S. 15:571.7, claims that his plea was not "intelligently" entered because subsequent statutory and departmental policy changes have had the effect of making parole for "lifers" more difficult to obtain.[1] In this case relator claimed that he was induced to plead guilty by "promises" that he would be considered for parole after he had served ten years and six months with good prison conduct and that the state's failure to keep the bargain entitles him to release or to withdrawal of the plea. After an evidentiary hearing, the district court granted postconviction relief and ordered that the plea be set aside.[2] We then granted the district attorney's application for certiorari. 457 So.2d 6.
On February 6, 1973, relator participated in a brutal murder during the armed robbery of a liquor store. After he and two others were arrested for armed robbery and murder, relator signed a written confession. At his arraignment on March 2, 1973, relator entered a guilty plea against the advice of his court-appointed lawyers. That plea was subsequently withdrawn, and the case was set for trial.
As a result of plea negotiations between defense counsel and the district attorney, relator on October 15, 1973 (only one day before the case was scheduled to be tried) again entered a guilty plea. The prosecutor accepted a plea of "guilty without capital punishment" and agreed to forego prosecuting relator for armed robbery.[3] At the guilty plea, the trial judge conscientiously *1306 canvassed on the record the rights being given up by relator and assured himself that relator understood the elements of the offense to which he was pleading and the mandatory life sentence which was to be imposed.[4] The judge also determined on the record that relator had discussed his rights and the consequences of his plea with his two court-appointed lawyers, who were both present in court.
At the time of relator's plea, life sentence prisoners who conducted themselves as exemplary inmates were routinely recommended by the superintendent of the prison for commutation of sentence (and parole eligibility) after serving ten years and six months.[5] The procedure was actually a two-step process. In the first step, the prisoner could apply for commutation of his sentence with the approval of the superintendent of the prison, and the governor, upon recommendation of certain officials, could cummute the sentence to a fixed term of years, but the period of incarceration could not be reduced below ten years and six months.[6] Once the governor commuted a sentence, the prisoner could become eligible to apply for parole, which was the second step in the procedure. These so-called "10-6 lifers" were, as a result of the statutory scheme and the prison policy existing at the time, frequently freed on parole.
In 1974, Louisiana adopted a new constitution with a restructured Board of Pardons. La. Const. Art. IV § 5E (1974).[7] In 1973 and again in 1976, Louisiana adopted new capital sentencing provisions which statutorily eliminated the possibility of parole for newly-convicted murderers sentenced to life. See Acts 1973, Nos. 109 and 111; Acts 1976, Nos. 694 and 657. In 1979, La.R.S. 15:571.7 was repealed. See Acts 1979, No. 490. Coincidental with the changes in the statutory scheme was a change in the attitude and in the policy of the officials who reviewed applications for commutations and parole.[8]
*1307 On August 8, 1983, nearly ten years after his plea, relator filed an application for postconviction relief, contending that his plea had been induced by "promises" of consideration for parole eligibility after ten years and six months of imprisonment with good behavior. The evidence in the postconviction hearing conducted by the successor of the original trial judge established that relator's lawyers advised him of the then-existing practice regarding life sentences. He was therefore fully aware of the possibility of parole release after serving ten years and six months. Relator and his two experienced defense attorneys had also thoroughly discussed the available options. The strength of the state's case (including the confession) and the stark facts of the brutal murder obviously convinced them that there was little to gain by going to trial (even though Furman had effectively eliminated the possibility of a death sentence). On the other hand, relator's attorneys advised him that the proposed plea bargain offered the possibility of avoiding an additional conviction for armed robbery, with a sentence that had to be imposed without benefit of parole and that could be imposed consecutively for as long as 99 years of imprisonment. See La.R.S. 14:64; La.C.Cr.P. Art. 883. Of course, a nonparolable sentence for a significant term would have adversely affected relator's chances for possible commutation and parole of a life sentence for murder.
Relator and his lawyers apparently weighed all of these considerations when relator reached his decision to plead guilty. However, he now contends that his plea was based almost solely on representations by his lawyers that he would be considered for parole on his life sentence after ten years and six months of prison with good behavior and that this "promise" was the controlling factor in his decision to plead guilty.
We initially observe that relator had no vested interest in the continuation of the "10-6 policy" which existed at the time of his plea. Likewise, he had no vested interest in the structure of the pardon board or in the statutory scheme which permitted the superintendent to recommend commutation (or, actually, to approve prisoner's applications to the governor, which was tantamount to a recommendation). These statutory rules and practices did not create substantive rights, but were merely matters of procedure. The subsequent statutory and policy changes did not offend the principle that ex post facto changes in the substance of a criminal penalty for an offense cannot work to the disadvantage of the accused. See State v. Dunn, 408 So.2d 1319 (La.1982). Compare State v. Curtis, 363 So.2d 1375 (La.1978).
Moreover, there was no automatic commutation or eligibility for parole under the former La.R.S. 15:571.7. Relator may still apply to the Board of Pardons for a reduction of his sentence under the present La. R.S. 15:572. Indeed, the former statute's requirement for a minimum period of confinement before eligibility for commutation no longer exists, and the present statutes governing a life-sentence prisoner's right to seek commutation and parole are actually more favorable. It is the policy of those reviewing the applications that has changed and has significantly decreased the possibility of commutation and parole.
Second, relator's expectations arising from the professional assessment of then-existing policy expressed by defense counsel cannot be equated to a "promise" which induced a plea and which therefore must be kept under penalty of invalidity of the plea.[9] A guilty plea agreement, by its very *1308 nature, represents for a defendant a choice between unpleasant alternatives. When the choice is between going to trial against overwhelming evidence and pleading guilty to a serious offense, neither affords the prospect of a "pleasant journey". Viewed from the perspective of the criminal offender, the plea frequently represents, as in this case, the lesser of two evils.
Various safeguards have been designed to assure that a guilty plea represents an accurate acknowledgement of guilt and is entered into with as full and complete an awareness of the risks, options, consequences, and possible benefits as is feasible. These rules and procedures also serve to assure finality for guilty pleas, which, after all, are convictions. See Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Thus, the accused is entitled to have a lawyer represent him and advise him competently, as well as to have the judge determine on the record that the accused understands the basic constitutional rights he is giving up and the possible sentence to be imposed. The accused is also entitled to enforce any promises which served as substantial inducements to his entering the plea (or to be permitted to withdraw his plea). Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).
In the present case, the record does not establish that relator was substantially induced to plead guilty by unkept promises or by misrepresentations on the part of the district attorney or his attorneys. The district attorney's inducement to relator was to agree not to pursue armed robbery charges which very likely could have been successfully prosecuted. This promise eliminated relator's exposure to an additional nonparolable sentence of as much as 99 years. Because relator was obviously convinced that he could not successfully contest his guilt to either murder or armed robbery, and because he was hoping for a sentence which would give him the best possibility of gaining release on parole as early as possible, the promise to dismiss of the armed robbery charges significantly enhanced his chances for parole. That promise, therefore, was not at all insignificant.[10]
As to any "promise" by relator's attorneys, although the record clearly established that relator's attorneys informed him of the practice under which life sentences were frequently commuted and parole granted after "10-6", he was never promised by his attorneys that he would be released. His lawyers testified at the hearing that they made no promises or guarantees to relator and reached no understanding with him that his release on parole was automatic. Relator was certainly motivated by the hope for an early release on parole, and he actually had a reasonable expectation of that possibility based on the lawyers' competent assessment of the situation as it existed at the time of his plea. Nevertheless, his lawyers made no representation which would justify relator's belief that he was pleading guilty in exchange for a promise or guarantee (other than dismissal of the armed robbery charge).
The essence of the advice by relator's attorneys was that the best possibility for gaining release from custody was to plead guilty, accept a life sentence, behave in an exemplary fashion, and hope to be released on parole. Relator understood and accepted this competent advice, which canvassed the full range of possibilities.[11] *1309 His guilty plea was therefore clearly the result of an informed decision that this was his best course of action under the existing circumstances. The fact that commutation and parole were not immediately forthcoming at the end of ten years and six months does not vitiate the voluntariness of his plea. This was an acceptable risk of which relator was aware on the basis of the advice given to him by his lawyers. The fact that things did not work out as he had hoped does not render his plea involuntary and certainly does not reflect a "breach" of any "bargain" made by the state.
We therefore conclude that the trial court erred in holding that the relator's "expectation" was enforceable so that the guilty plea must be set aside (at great prejudice to the state since the offense was so old that evidence presumably would be difficult to reassemble). To set aside a clearly voluntary guilty plea because unforeseen changes in the attitude and policy of the executive branch toward commutation and parole have substantially lessened the possibility of release would unnecessarily undermine the finality of such pleas.
The judgment of the trial court is reversed, the postconviction application is denied, and relator is remanded to the custody of the Department of Corrections.
CALOGERO, J., concurs and assigns reasons.
CALOGERO, Justice, concurring.
The matter disposed of in the majority opinion has been properly treated and resolved. However, there may be other problems with defendant's October 15, 1973 guilty plea which the Court does not see fit, and properly so, to examine as a possible error patent.[1]
It is difficult to ascertain from the record alone whether Turner knew the specific crime to which he pleaded. At various times during the proceeding, the trial judge relied upon a statute which went into effect after the commission of the crime.
Furthermore Boykin requires that a defendant pleading guilty must be told of certain rights, among them the right to confront witnesses against him. The trial judge's explanation of this right may not be sufficiently clear. See State v. Cressy, 440 So.2d 141 (La.1983); State v. Age, 417 So.2d 1183 (La.1981); State ex rel. Jackson v. Henderson, 260 La. 90, 255 So.2d 85 (1971).
NOTES
[1] See State v. Dunn, 408 So.2d 1319 (La.1982); Dunn v. Maggio, 712 F.2d 998 (5th Cir.1984); Hall v. Maggio, 697 F.2d 641 (5th Cir.1983); Garrett v. Maggio, 685 F.2d 158 (5th Cir.1982); Hayes v. Maggio, 699 F.2d 198 (5th Cir.1983).
[2] The trial court initially granted relief without an evidentiary hearing on the basis of the petition and the record and ordered the Department of Corrections to release relator on parole if he was eligible under the rules and regulations concerning parole release for prisoners with good behavior. This court reversed and ordered an evidentiary hearing to determine whether defendant's case differed from State v. Dunn, 408 So.2d 1319 (La.1982), a case in which we reversed the granting of relief based on a similar allegation. 441 So.2d 206.

After the hearing, the trial court again ordered that relator be released on parole if eligible on the basis of his conduct. No findings were made with respect to differences between this case and Dunn. This court again reversed and remanded for reconsideration, with instructions that the trial court had no authority to order the parole board to release relator. We noted that the trial court could order that the plea be set aside if such action were warranted. 450 So.2d 643.
After a second hearing, the trial court again granted relief, this time ordering that the plea be set aside. That ruling is now before us for review.
[3] Former La.C.Cr.P. Art. 557 provided for the plea of "guilty without capital punishment" which resulted in a sentence of life imprisonment, rather than death. For a history of this statutory scheme, see State v. Jett, 419 So.2d 844 (La.1982). The "guilty without" plea was eliminated by Acts 1973, No. 134.
[4] The trial judge erroneously referred to the name of the offense to which relator was pleading as "second degree murder". Relator's offense predated the 1973 amendments which created first and second degree murder. Prior to those amendments, the crime of murder included both specifically intended killings and "felony murder" (unintended killings during certain enumerated felonies). See Acts 1942, No. 43; Acts 1973, Nos. 109 and 111 (effective July 2, 1973). Nevertheless, the trial judge properly enumerated the elements of the offense of "murder" to which relator was pleading. Relator suffered no prejudice from the error in the "name" of the offense.
[5] Various documents and articles in the record demonstrate the policy under which life-sentence prisoners were generally released on parole after ten years and six months in prison with good behavior. A letter from the district attorney, written to one of the defense lawyers, reinforces relator's assertion that this policy was in effect prior to and at the time of his plea. Furthermore, in State v. Dunn, above, we found that the practice was established by the evidence presented at the hearing. See also Garrett v. Maggio, above.
[6] Former La.R.S. 15:571.7 provided:

"Whenever a prisoner who has been convicted of a crime and sentenced to imprisonment for life, so conducts himself as to merit the approval of the superintendent of the state penitentiary he may apply for a commutation of his sentence and the application, upon approval of the superintendent, shall be forwarded to the governor. The governor may commute the sentence upon the recommendation in writing of the lieutenant governor, attorney general, and presiding judge of the court before which the conviction was had or any two of them. No commutation under this Section shall reduce the period of incarceration to less than ten years and six months."
[7] See also La.R.S. 15:572 et seq., which establish the procedures to be followed by the Board of Pardons. A review of those statutes reveals that a prisoner still has essentially the same statutory right to apply to the proper reviewing authority for executive clemency. As will be further discussed, he has no right to have a "receptive attitude" on the part of the pardon authority.
[8] In a thought-provoking article entitled "The Forgotten Men", The Angolite, May-June, 1980, pp. 23-56, which was introduced into evidence at the hearing, the author traces what he perceives to be the history of the practice of granting parole release after ten years and six months to "lifers" who had behaved well. The author speculates, possibly correctly, that the change of attitude toward the parole release of "lifers" came in the wake of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and other cases which freed significant numbers of inmates from death sentences and, in effect, required reimposition of sentences to life imprisonment.

Understandably, society wanted more assurance of continued incarceration of certain dangerous criminals who had been spared from capital punishment. Possibly as a result of this attitude, the Legislature specifically eliminated the possibility of parole in the statutes which provided life sentences for first or second degree murder, aggravated rape and aggravated kidnapping  all of which were crimes for which the death penalty could formerly be imposed. See La.R.S. 14:30, 30.1, 42, 44. This legislative policy, which perhaps reflected the "tough" attitude of the electorate, may also have been paralleled by a "tough" attitude adopted by the pardon board and the governor.
[9] Compare Hayes v. Maggio, above, in which the unrebutted evidence in the record established that relator received a distinct promise from the prosecutor that his sentence would be automatically commuted after he had served ten years and six months.
[10] Thus, we reject relator's contention that his case differs from Dunn, in which the accused arguably pleaded guilty to avoid the death penalty, a threat not present in this case. Relator's argument that he had nothing to lose by going to trial (or nothing to gain by pleading guilty) ignores the substantial benefit flowing from the dismissal of the armed robbery charge.
[11] Under Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), an attorney's performance in representing and advising an accused in connection with his guilty plea must be evaluated on the basis of a standard of "reasonably effective assistance". The first stage of such analysis is the determination of whether counsel's performance was "deficient"; that is, whether "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed an accused by the Sixth Amendment". 104 S.Ct. at 2064. As noted, the performance of counsel in giving advice here was not at all deficient. The attorneys provided competent advice based on their best estimate of the situation under the existing scheme, and the advice was sound despite the fact that the recommended course of action did not produce the desired result.
[1] The only matter before us now concerns whether defendant's plea was involuntary because it allegedly was induced by defendant's belief that he would become eligible for parole after ten and one-half years.