942 So.2d 652 (2006)
STATE of Louisiana, Appellee,
v.
Delandro Chamichael DAVIS, Appellant.
No. 41,430-KA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2006.
*653 Louisiana Appellate Project by Annette F. Roach, for Appellant.
Paul J. Carmouche, District Attorney, Dale G. Cox, Edward M. Brossette, Assistant District Attorney, for Appellee.
Before GASKINS, DREW and LOLLEY, JJ.
LOLLEY, J.
This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana. The defendant, Delandro Chamicheal Davis, pled guilty to a reduced charge of first degree robbery, and he was sentenced to eight years at hard labor without benefit of parole, probation or suspension of sentence. La. R.S. 14:64.1. Davis now appeals, and for the following reasons, we affirm.

FACTS
The following facts were taken from police incident reports, testimony from a preliminary examination, and testimony during Davis' plea hearing.
On November 16, 2002, shortly after 12:00 a.m., Davis and three others, Gatson Craig, Brian Robinson, and Derrick White, went to the residence of Katrina Oliver and Marquell Pierson located at 2544 Malcolm Street in Shreveport, Louisiana with the intent to commit a home invasion robbery. Pierson was not at the residence at the time; however, Oliver was there with her young son who slept during the entire event.
Davis admitted that he and Craig gained entry into the home under the pretense that Davis (who knew Oliver personally) was having car trouble and needed to use the telephone. White acted as a look-out in the front of the house while Robinson went to the back of the house. Once Oliver opened the door for Davis, who pretended to go over and use her telephone, Craig entered the residence, placed a gun to Oliver's head, and forced her to the floor. Oliver then told the pair something to the effect that what they wanted was in the closet. Davis then retrieved money and approximately two pounds of marijuana from the closet.[1] Prior to leaving the residence, Davis took a turn holding the gun to Oliver's head.
The home invasion team left the scene of the robbery and headed to Craig's house to drop off the gun used during the robbery. Oliver left her residence, traveling nearby to a friend's (Michelle Lindsey) home from where she telephoned police and Pierson. At the time he received Oliver's telephone call, Pierson was a passenger riding in a black Toyota Corolla owned by Lindsey and being driven by Broderick Gandy, Lindsey's boyfriend. After receiving the call, Pierson and Gandy proceeded *654 to Lindsey's home. While in route to Lindsey's, Pierson spotted Davis in the car being driven by Robinson.
At this time, the home invasion team had traveled from Craig's house to Hearne Avenue in route to a convenience store. As they were traveling northbound on Hearne Avenue, the car, being driven by Gandy, made a u-turn and followed them. Somewhere near the intersection of Hearne and Malcolm Street, shots were fired from the black car. The vehicle carrying the home invasion team, driven by Robinson, turned on Malcolm Street away from the shooter in the black vehicle. Both Robinson and Davis, by a photographic lineup, later identified Pierson as the shooter and Gandy as the vehicle driver.
As police officers were taking the report from Oliver regarding the earlier home invasion, they heard the shots being fired, then saw the car driven by Robinson pass their location with a broken-out driver's side window. The officers pursued the vehicle that eventually stopped with the driver, Robinson, running from the vehicle. Officers ordered the back seat passengers (Davis and Craig) from the vehicle and discovered White slumped in the front seat-he was pronounced dead at the scene. Davis and Craig were both eventually arrested for armed robbery. Codefendant Robinson later surrendered to police and was charged with armed robbery as well.
During their investigation, police took statements from many of those involved in the two crimes including the three remaining members of the home invasion team (Davis, Robinson, and Craig), Pierson (the shooter), Gandy, Oliver, and Lindsey. Pierson was eventually arrested for White's murder.
Pursuant to a plea agreement with the state, Davis agreed to testify at the trial of his codefendants in connection with the robbery case and in Pierson's murder trial. Davis was allowed to plead guilty to a reduced charge of first degree robbery, as per the agreement with the state. Furthermore, the state agreed not to file a habitual offender bill against Davis. Ultimately, Davis was sentenced to 8 years of hard labor, without the benefit of parole, probation or suspension of sentence, to be served consecutively with a prior sentence. The trial court denied Davis' motion to reconsider his sentence, and this appeal ensued.

DISCUSSION
In his only assignment of error, Davis argues that the trial court imposed a sentence exceeding what Davis was told he should expect to receive as inducement for his plea of guilty. Specifically, Davis states that as part of his plea agreement, he was told that his sentence would be between six and seven years and that the sentence would be consecutive to another sentence he was already serving. Davis further argues the remedy for the breached plea agreement is specific performance whereby he would receive a sentence between six and seven years. We disagree.
It is well settled that a plea agreement is considered a contract between the state and the criminal defendant. State v. Peyrefitte, XXXX-XXXX (La.10/15/04), 885 So.2d 530; State v. Wynne, 40,921 (La. App.2d Cir.04/12/06), 926 So.2d 789.
A guilty plea is invalid when the defendant is induced to plead guilty by a plea agreement or by what the defendant reasonably believes is a plea agreement and the terms of the bargain are not satisfied. State v. Dixon, 449 So.2d 463, 464 (La.1984); State v. Beverly, 37,301 (La. App.2d Cir.08/20/03), 852 So.2d 1149. Even in the absence of a plea bargain, if a defendant justifiably believes there was one and pled guilty in part because of that *655 justifiable belief, the guilty plea was not knowingly made, and in such a case, the plea must be set aside and the defendant allowed to plead anew. State v. Robinson, 33,921 (La.App. 2d Cir.11/01/00), 770 So.2d 868. When a plea bargain is breached, the defendant has the options of specific performance or to withdraw the guilty plea. State v. Byrnside, 34,948 (La.App.2d Cir.08/22/01), 795 So.2d 435.
A plea of guilty will not be set aside upon a defendant's unfulfilled expectation of gaining release as early as possible. State ex rel. Turner v. Maggio, 463 So.2d 1304 (La.1985). However, if a guilty plea is induced by a plea bargain, or by what a defendant justifiably believes was a plea bargain and he pleaded guilty in part because of that justifiable belief, the bargain must be enforced or the relator be allowed to withdraw from the plea. State ex rel. Miller v. Whitley, 615 So.2d 1335 (La.1993).
In determining the validity of agreements not to prosecute or of plea agreements, Louisiana courts generally refer to rules of contract law, while recognizing at the same time that a criminal defendant's constitutional right to fairness may be broader than his or her rights under contract law. The first step under contract law is to determine whether a contract was formed in the first place through offer and acceptance. La. C.C. art.1927. The party demanding performance of a contract has the burden of proving its existence. In the context of plea bargains, a defendant may demand specific performance of the state's promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right. State v. Givens, XXXX-XXXX (La.01/17/01), 776 So.2d 443.
A trial court has broad discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, an appellate court may not set aside a sentence as excessive. State v. Guzman, XXXX-XXXX (La.05/16/00), 769 So.2d 1158; State v. Bright, 39,003 (La. App.2d Cir.10/27/04), 886 So.2d 1183.
Based on the record, we do not believe that there was an agreed or predetermined sentence promised in connection with Davis' plea agreement. While the trial court did mention a possible sentencing range, there was no absolute agreement as to the sentence that Davis would receive prior to the guilty plea being entered.
During the hearing where Davis entered his guilty plea, the state presented the following:
State: . . . Your Honor, pursuant to the bench conference it's the state's understanding that the defendant wishes to enter a plea of guilty to one count of first degree robbery, responsively, with the understanding that the sentencing will be by the Court. The only thing that the State is putting on the record, the state has stated to defense counsel and the defendant that it will not file a habitual offender bill. However, that is subject to the defendant testifying truthfully against the codefendant and truthfully in the Marquell Pierson homicide trial. . . . (Emphasis added).
Counsel for Davis indicated his agreement and understanding to the plea bargain. After questioning Davis regarding his understanding of the agreement, the following exchange took place:
The Court: And finally, with respect to your own sentence for your guilty plea to first degree robbery this Court has discussed with your lawyer on Mondayor I shouldn't say Monday because Mr. Swift [Davis' trial counsel] was not a part of that discussionthat I discussed *656 with the state and the attorneys for the codefendants Mr. Robinson and Mr. Gaston that if certain circumstances develop you would receive from this court 6 years at hard labor. That was not accepted on Monday but I've indicated to Mr. Swift your lawyer on yesterday evening and this morning that if everything works out favorably in terms of you testifying and whatnot, then this Court will consider a sentence of 6 to 7 years. Has this been explained to you?
Defendant: Yes, sir.
The Court: But you understand you will not be sentenced today?
Defendant: Yes, sir.
The Court: I want to wait and see how you cooperate and to what extent you cooperate before the Court determines what your sentence will be. I don't want you to be misled and misunderstand that your sentence is locked in at 6 or 7 years. I don't want you toBut I'm telling you and I'm saying it on the record, if everything works out as we are discussing then that would be the type of sentence you will get. (Emphasis added.)
Defendant: Yes, sir.
The Court: And the reason I went up to seven is because had you agreed do (sic) this on Monday it would have been six but you waited until today so then it will probably be seven. Do you understand that?
Defendant: Yes, sir.
The Court: Okay. Now, with that understanding-Let me mention one other thing. I mentioned to Mr. Swift that at the time of this offense took place I'm told that you were on probation.
The Defendant: Right.
The Court: And that you were backing up some time.
The Defendant: Right.
The Court: But I told Mr. Swift that I'm not making a commitment to whether this will run concurrent or consecutive to that time that you've been in jail on that other charge. Do you understand that?

The Defendant: Yes, sir.

The Court: But I will consider it again based upon how all of this works out with your testimony.
The Defendant: Yes, sir.
The Court: Okay. Because the State wants the Court to favorably consider your testimony in these other matters. Do you follow me?
The Defendant: Yes, sir.
The Court: Anything I've said so far you don't understand?
The Defendant: No, sir.
(Emphasis added). Thereafter, the trial court went on to accept Davis' guilty plea to first degree robbery.
When inquiring about promises made to Davis, the trial court stated the following:
The Court: Now, I know we promised you what the charge would be, first degree robbery. I know we promised you that you would not be multi-billed, and I have indicated to you with respect to sentencing the court will probably sentence you to 6 or 7 years if everything works out. And I will make a determination whether or not it would be consecutive or concurrent, but I didn't promise you that I would do that. I just indicated to you that's what the court will do if these matters turned out like we want them to; is that correct?
Defendant: Yes, sir.
The Court: Has anybody promised you anything else that we need to talk about on the record?

*657 Defendant: No, sir.
(Emphasis added).
On November 7, 2005, Davis was brought again before the trial court for sentencing. The sentencing occurred almost two years after Davis entered his guilty plea on October 16, 2003. From the dialogue at the sentencing hearing, it appears that Davis testified as requested in Pierson's murder trial, which ended in a mistrial. Because Pierson died prior to his retrial, Davis was not required to testify again. Also, it appears that all of Davis' codefendants pled guilty without the necessity of a trial.
At the sentencing, the trial judge noted:
Now, all of the Court's consideration for sentencing had to do with your willingness to participate as a witness for the State in a homicide case, for which you did participate, but that case resulted in a mistrial, and as I've already stated, Mr. Pierson has since died and was not retried as we had anticipated for purposes of your sentence which would have helped you even more so, or possibly could have helped you more so.
When Davis expressed his displeasure in receiving a sentence greater than six or seven years, the following exchanged occurred:
The Court: And does the transcript say that you were committed to six to seven years?
The Defendant: It said you would be inclined to give me six to seven years for my cooperation.
The Court: That's right. And when I heard the testimony that I heard, I never would have given you that kind of consideration based upon the evidence that I heard. This was a horrible incident for which you are being given favorable consideration because you testified, and I don't take that lightly. And I even have given you some consideration because now I think you are a different person than you are (sic) at the time you committed this crime. So I just want to make certain you understand, I considered it and I considered it favorably for you, because I wouldn't have given you eight years based upon what you did. And why you didn't get what other people get (sic) hador got, I'm sorryyou didn't get the sentence that some other individuals received had to do with what this Court understood your participation, your actions, and individually what your criminal history was compared to others. . . .
Considering the record as a whole, we conclude that there was no specific sentence guaranteed or promised to Davis as part of the plea agreement. The state met its obligations under the plea agreement-to reduce the charges against Davis and not to file a multiple offender bill of information. The state kept this agreement. Davis was to testify truthfully against his codefendants and Pierson. It appears that Davis' testimony against the codefendants was unnecessary, and further testimony against Pierson was moot after his death. However, the trial judge indicated during the plea hearing that the sentence would be determined at a later date and that several factors would be considered in making the determination, including Davis' cooperation with the prosecution of his codefendants and with the prosecution of Pierson. While the trial court did give a potential range for the sentence, he did not commit to a particular sentence or whether the sentence imposed would be consecutive or concurrent to the sentence Davis would receive for his probation violation. The trial court went to great lengths to inform Davis that the sentence had not been determined at the time the guilty plea was accepted. There was no agreement between *658 Davis and the state as to the actual sentence, which the state indicated at the time would be left to the trial court. Davis, who agreed to this at the time the plea was entered, cannot now allege there was a sentencing agreement that demands specific performance. The trial judge was well within his sentencing discretion, and thus, this sentence should not be disturbed by this court. This assignment is without merit.

CONCLUSION
For the foregoing reasons, Delandro Chamicheal Davis' conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Katrina Oliver told police she had just gotten paid and the money ($430) was in the home.