512 So.2d 615 (1987)
STATE of Louisiana, Appellee,
v.
Tony Ray EVANS, Appellant.
No. 18721-KA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1987.
Rehearing Denied September 17, 1987.
*617 Richard C. Goorley & Richard E. Hiller, Asst. Indigent Defenders, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul J. Carmouche, Dist. Atty., A. Marty Stroud, III and Tommy Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendant, Tony Ray Evans, was charged by amended indictment with second degree murder committed with a firearm, LSA-R.S. 14:30.1 and 14:95.2. After a jury trial, he was found guilty as charged and was sentenced to the mandatory life term at hard labor without benefit of probation, parole or suspension of sentence. He now appeals, advancing three assignments of error.[1] For the reasons expressed, these assignments do not present reversible error and Evans's conviction and sentence are affirmed.

FACTS
The victim, Dewey Furr, ran a cabinet shop on Edwards Street in downtown Shreveport. On the evening of September 1, 1985, Furr was putting in a late night of work along with his assistant, Richard Leber. Apparently because of the heat, they had left open the two large bay-style doors, one facing east onto Edwards Street and the other facing south on Cotton Street. At around 10:00 p.m., they noticed two black males walking very slowly past the first door and not continuing past the second. Leber grew suspicious because there is very little pedestrian traffic downtown at that time of night. When after ten minutes the pedestrians had neither walked by the second door nor crossed the street, Leber walked out the Edwards St. door; they were not to be seen. He returned inside the shop and immediately noticed them walking past the second door at an extrememly slow pace. Leber remarked to Furr that the two men looked suspicious. He went back to the Edwards St. door, walked to the corner, and saw them standing in front of the next store front, roughly 30 feet away.
Leber walked up to them and asked, "What are you all doing?" They replied that they were waiting for a ride and worked at the newspaper production plant down the street. Leber replied, "Well, okay," and started back toward the shop. One of the men then asked him if they could bum a cigarette. Leber had a pack of Marlboros in his front pants pocket so he said, "Okay," and handed them each a cigarette. About this time, Furr walked up from inside the shop and saw Leber standing with the two black men by the door. One of the strangers asked if this was a cabinet shop; Furr replied, "Yes." They then chatted for a minute or so. One of the strangers said that he had once worked making cabinets, but that he was now stuffing inserts in the newspaper and was trying to get a promotion to running the offset press. He added that he would not mind getting back into cabinet work again. Furr finally said that there had been burglaries in the area and that the merchants would patrol the area for unfamiliar people; more likely than not, someone would *618 call the police on them, and "nobody wanted that to happen." After he said this, the strangers started back down Cotton St. toward Marshall while Furr and Leber went back into their shop. Furr turned on the router, which blanketed the shop with a loud, buzzing noise.
Suddenly Leber noticed the two men were back in the doorway. One of them, dressed in a white T-shirt, had a pistol pointed straight at Leber. He said, "This is a hold up," and walked up to them, holding the pistol about two feet from Leber and four feet from Furr. The unarmed man, dressed in a brown shirt, walked around Leber and started groping in his pants pockets. Terrified, Leber fixed his eyes on the aimed gun; he could see the bullet in the chamber. The unarmed man found the wallet in Leber's pocket and started to take it out. Suddenly the gunman fired at Furr and hit him in the neck. Leber spun around, dove under a table and scrambled out the Edwards St. door. He ran to the nearest phone and called the police.
The defendant Evans was apprehended a few days later, after detectives located the gun used in the shooting and the white shirt worn by the gunman. He was originally charged with first degree murder; by amended indictment, he was charged with second degree murder.

ASSIGNMENTS 1 & 3
By his first assignment, Evans claims the trial court erred in allowing an in-court identification. By the third, he claims the trial court erred in denying his request to make a part of the record Richard Leber's grand jury testimony dealing with the identification of the perpetrators.
At trial, the prosecutor conceded that Leber had been shown three pre-trial photographic lineups in which he never successfully identified the defendant. Leber said he had viewed only two. R.p. 201. However, he noted his assailant's build, facial coloration, shape, height and weight, and gave a description to the police. At trial, nine months after the incident, Leber was asked to look around the courtroom and determine if he could see the man who held the gun that night. Leber testified that he could not say he saw him for sure. He said, however, that Evans, who was seated at the defense table and stood up at the prosecutor's request, came close to the description he had given to the police officers and that though he was not 100% certain, Evans looked like the gunman in general appearance. R.p. 189.
The defense now contends the identification procedure was suggestive in that Evans was the only young black male seated at counsel's table and that there was no independent source to support the identification, as evidenced by the three failed attempts of photographic identification.
The thrust of this argument is dispersed by the fact that there never was a positive, pre-trial identification. A pre-trial identification is not a prerequisite to an in-court identification. State v. Long, 408 So.2d 1221 (La.1982); State v. Jackson, 337 So.2d 508 (La.1976). Furthermore, there is no suggestion of taint, so it is difficult to see how the failed photographic lineups have any bearing on the case; our supreme court, when faced with the same question, has reached the same conclusion. In State v. Franklin, 381 So.2d 826 (La. 1980), the witness failed to identify the defendant both in a photographic lineup and in a physical lineup. The court held that failed identification "could not have led, of its own weight, to the possibility of misidentification." 381 So.2d at 827. Similarly, in State v. Wright, 410 So.2d 1092 (La.1982), the photographic lineup produced a suspect who only "resembled" the defendant and, at trial, the witness could not positively identify the defendant as the assailant. The court held that the degree of identification goes to the weight of the evidence. Testimony concerning partial or tentative identifications or statements that the offender "resembles" the accused are admissible into evidence. 410 So.2d at 1096. We therefore dismiss the claim that the failed pre-trial identification tainted or *619 had any bearing on Leber's in-court identification.[2]
The issue therefore becomes one of the reliability of the in-court identification. Contrary to the defense's assertions, the fact that the defendant is the only black male seated at counsel's table does not by itself invalidate the identification. State v. Drew, 360 So.2d 500 (La.1978), cert. denied 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1979); State v. Daniels, 326 So.2d 340 (La.1976), cert. denied 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976). Rather, it is one factor to be considered in assessing the overall reliability of the identification. If the defense is allowed ample opportunity to cross-examine the witness, there is usually ample opportunity to remedy any suggestiveness in the identification. State v. Drew, supra; State v. Buie, 477 So.2d 157 (La.App. 1st Cir.1985). This would also remedy the alleged suggestiveness of asking the defendant to stand up. Cf. State v. Simms, 341 So.2d 874 (La. 1977).
In the instant case, the witness was carefully cross-examined in an effort to discredit his recollection of the incident. We likewise have analyzed the facts borrowing the analysis of Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), to see whether a proper foundation was laid for the in-court identification.[3] Leber spoke to Evans for a few minutes out on the street corner and was close enough to have handed him a cigarette, although the lighting was poor out on the street. Moments later, the defendant and his accomplice entered the shop and Leber got another brief view; things happened quickly and Leber admittedly focused his attention more on the gun than on the gunman. Leber nevertheless gave a description of the gunman as six feet tall, 150 to 160 pounds, short hair and no facial hair; and dressed in a white T-shirt and blue jeans; and there was a detailed description of the gun itself. Leber's degree of certainty in identifying the defendant was only moderate, although he was certain that Evans fit the general description.
Given this evidence, we cannot say that Leber's in-court identification was so lacking in independent source as to be unreliable and inadmissible. It was as concrete as the circumstances allowed and it did not change between the time of the line-up and the trial. Having met the standards of Manson v. Brathwaite, supra, the testimony was to be judged for its weight. As already noted, testimony concerning partial or tentative identifications or statements that the offender "resembles" the accused create doubt or inconclusiveness that bears on the weight of the evidence, not its admissibility. State v. Wright, supra. It was certainly within the jury's province to weigh this evidence and to judge it appropriately.
By his third assignment, Evans claims the trial court erred in refusing to introduce into the record Leber's testimony before the grand jury. Ordinarily a defendant is not entitled to the production of a transcript of secret grand jury proceedings against him. LSA-C.Cr.P. art. 434.[4]State v. Sheppard, 350 So.2d 615 (La.1977). However, when the defense requests evidence that is favorable to the defendant and is material to guilt or innocence, the state must produce it. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). The Brady rule also applies to *620 evidence tending to impeach the testimony of a witness whose credibility or reliability may be determinate of guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Davenport, 399 So.2d 201 (La.1981).
In an effort to accommodate these competing interests, the supreme court has authorized an in camera inspection of the grand jury transcripts by the trial judge. State v. Peters, 406 So.2d 189 (La.1981); State v. Ates, 418 So.2d 1326 (La.1982). The judge privately views the secret transcripts to determine whether they contain Brady material and should be disclosed to the defendant. Disclosure is in the sound discretion of the judge. State v. Trosclair, 443 So.2d 1098 (La.1983), cert. dism. 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984); Douglas Oil Co. v. Petrol Stops U.S., 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).
In the instant case the trial judge stated that he had already reviewed the transcript of Leber's testimony before the grand jury and found no inconsistencies. He therefore refused to make the grand jury transcript part of the record. Given his compliance with State v. Peters, supra, we cannot find error in this refusal.
Neither of these assignments presents reversible error.

ASSIGNMENT 4
By this assignment Evans claims the trial court erred in denying the motion for new trial and post verdict judgment of acquittal, LSA-C.Cr.P. arts. 851, 821. He asserts that the evidence, even when viewed in the light most favorable to the prosecution, does not support a finding of guilt beyond a reasonable doubt. He specifically argues that the evidence against him was circumstantial and insufficient to exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438.
The constitutional and statutory standard of review for the sufficiency of evidence is whether, viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984), LSA-C. Cr.P. art. 821. The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. This statutory rule is not a purely separate test from the Jackson standard in cases of circumstantial evidence. State v. Wright, 445 So.2d 1198 (La.1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Sutton, 436 So.2d 471 (La.1983). The statutory rule, however, provides a guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is, therefore, a component of the more comprehensive reasonable doubt standard, when circumstantial evidence is used to convict. Thus, although the circumstantial evidence rule may not establish a stricter standard of review than the more general formula, it does emphasize the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Chism, 436 So.2d 464 (La.1983); State v. Eason, 460 So.2d 1139 (La.App. 2d Cir. 1984), writ denied 463 So.2d 1317 (La.1985).
The first segment of the state's evidence established how the shooting occurred. We have already detailed Leber's testimony in the exposition of facts. Officer Childress testified that he received Leber's call at about 10:25 p.m.; fireman Lazareth was the first official to arrive at the scene. Both officers confirmed Leber's description of the site where the shooting occurred. Furr had not been killed instantly, but had crawled on the floor into his office leaving a trail of blood. Dr. McCormick, *621 the Caddo Parish coroner, testified that Furr died of blood loss. Officer Rogers inspected the scene and found two cigarette butts that had been recently smoked and discarded on the south side of the building. These were not dusted for fingerprints, as they were considered more likely to yield to chemical analysis. Officer Rogers also retrieved Leber's wallet from the floor of the shop. Because of its grainy surface, it could not be dusted for fingerprints.
Sgt. McGrew testified that he recovered a gun from under the house at 214 Boisseau Street; Leber was certain that this was the gun used in the shooting and forensic evidence proved it. Sgt. McGrew also retrieved a T-shirt and a knit shirt from the house at 1007 Howell Street; Leber said one of these looked like the shirt worn by the gunman.
The next segment of the state's evidence recreated Evans's path after the shooting. Betty Louise Smith testified she was familiar with Evans and identified him in court. She saw him on the night of September 1 between 10:00 and 10:30. He ran up to her house at 611 Spring Hill, hot, sweaty and gasping for air, as though he had been jogging. He was wearing no shirt, just blue jeans. He approached the house and asked to speak to her stepson, Barron Cooper. She went inside and fetched Barron, who at first did not want to talk to Evans. He nevertheless came outside, stepped off the porch and went to the side of the house with Evans, where they started talking; Mrs. Smith could not make out what they were saying.
Barron Cooper testified that he had known Evans for three years and "went with" Evans's sister. He said that when Evans came by that night, he was not wearing a shirt, was hot and sweaty, and was wearing blue jeans. He testified that Evans asked him to drive him home; Cooper could not do this because his car was not there. Evans told Cooper that he had gone downtown and shot a man; he had pointed the gun at the man and when the man reached in his back pocket, Evans fired. He said he "tried to shoot him in the shoulder." R.p. 217. He added that he had attempted to rob two men; after he shot the old one, the young one ran away. The old man had fallen to the floor, bleeding from his mouth. Cooper further testified that Evans had seen someone named "Richard" in Cross Town and had given him the gun and the shirt. R.p. 218. Cooper testified that he had previously seen Evans with a .22 pistol.
Cooper's stepbrother, Cavarria DeWayne Smith, had known Evans for a few months and was present at the house when Evans came by that night. He heard two people talking outside his bedroom window. He could not understand what they were saying, but when he opened the window and peeped out, Evans asked him for a shirt. Smith noticed that Evans was wearing pants but no shirt, and looked like he had been jogging. Smith did not give him a shirt. Neither Smith nor Cooper knew what Evans did after he left the house.
Richard Spencer took the stand and testified that he has known Evans since third or fourth grade. On the night of September 1, he was standing in front of the Spar gym with two girls when Evans ran by, clad only in pants. Barely stopping, he handed to Spencer a folded-up white shirt, and asked him to hold it for him. Evans instantly ran off toward Everett Street, where his mother lived. Spencer noticed a hard object tucked inside the folded shirt; it was a pistol. Spencer took the shirt and gun to his grandmother's house, which was just on the other side of Howell Street, and hid them there. A few days later, after he heard there had been a shooting, Spencer removed the gun and went to return it to Evans. He looked for him in the Bottoms but could not find him. So he carried it to his aunt's house at 214 Boisseau Street, where he hid it under the house. He eventually led police to the house and pointed the gun out to them. The shirt remained in the grandmother's house on Howell St., and was eventually seized there. Spencer said he was sure that Evans had run by and given him the gun at 10:28 p.m. because he could see the CNB clock from where he was standing.
*622 The final segment of the state's case consisted of forensic evidence. Laura Johnson, an expert serologist from the North Louisiana Crime Lab, analyzed Evans's blood and saliva and compared it to the saliva on the cigarette butts found at the scene of the crime. One of these butts was incapable of being tested but the other showed saliva from a blood type B secreter. Tony Ray Evans is a blood type B secreter, and only 13% of the black population are B secreters. She admitted a degree of error of five percent in her testing, and conceded that she had never analyzed blood or saliva from Richard Spencer, Cavarria DeWayne Smith, Dewey Furr or Richard Leber.
Mr. Franklin, a criminalist at the Crime Lab, testified that the bullet found in Furr's body had been fired from the revolver recovered from the house on Boisseau St. and admitted in evidence at trial. The gun had not been tested for fingerprints. He further testified that gunpowder was present on Furr's shirt and suggested that the shot had been at close range, about 24 to 36 inches. This is reasonably consistent with Leber's testimony that the gun was about four feet from Furr's body.
The defense presented testimony of a jailer who said he has never seen Evans smoke a cigarette. He added that Evans has grown in muscularity since his detention a few days after the incident. The defense's other witness was an investigator from the Public Defender's Office. He testified that contrary to Richard Spencer's testimony, he could not see the CNB clock from the place where Spencer claims to have seen it.
Admittedly the state's case is heavy with circumstantial evidence. Nevertheless, this evidence viewed most favorably to the prosecution demonstrates that Furr was shot with a pistol that the defendant handed to Richard Spencer at approximately the time when the crime was reported. The defendant also handed to Spencer a shirt that Leber testified was similar to the one worn by the gunman. When the transfer took place, the defendant was not wearing a shirt; was sweaty and out of breath; and seemed to be in a hurry. Moments later, defendant came to Barron Cooper's house, still shirtless, perspiring and gasping for air. He confessed to shooting an old man whom he had attempted to rob at gunpoint; he also mentioned the young man running off. This completely corroborates Leber's description of the incident. At Barron Cooper's, defendant begged for a shirt and a ride home. The inevitable conclusion to be drawn from this evidence is that the defendant was fleeing from the scene of a crime, trying to hide the murder weapon, and attempting to get rid of his identifiable clothing. His admission of crime to Barron Cooper was too accurate to be accidental; thus it is especially incriminating. The pistol he gave to Richard Spencer was the weapon that fired the fatal shot. This, together with the plain effort to escape and to hide the evidence, completely excludes any other reasonable hypothesis. The defense has certainly offered none, other than to insist that Evans is not the guilty party. The inconclusiveness of Leber's identification and of the saliva tests does not counteract the concrete forensic evidence and the testimony of Barron Cooper, Cavarria Smith and Richard Spencer. Rather, it tends to corroborate it. The evidence as a whole does not leave room for reasonable doubt. The fact that some witnesses' testimony suffered from minor inconsistencies in the reporting of the time and the sighting of the CNB clock, does not detract from its unavoidable impact. The jury concluded that these witnesses were credible. State v. Robertson, 421 So.2d 843 (La.1982); State v. Austin, 470 So.2d 406 (La.App. 3d Cir.1985). This evidence, viewed in light most favorable to the prosecution, proves beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that Tony Ray Evans killed Dewey Furr while engaged in the attempted perpetration of armed robbery. LSA-R.S. 14:30.1(2).
This assignment does not present reversible error.
For the reasons expressed, the conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

*623 ON APPLICATION FOR REHEARING
Before LINDSAY, NORRIS, MARVIN, SEXTON and HALL, JJ.
Rehearing denied.
NOTES
[1] The original assignment of error No. 2 is neither argued nor briefed so it is considered abandoned. URCA-Rule 2-12.4; State v. Williams, 338 So.2d 672 (La.1976).
[2] In fact, the state might have acted improperly had it not disclosed evidence of the failed pre-trial identifications. State v. Curtis, 363 So.2d 1375 (La.1978).
[3] These factors include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. See also Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
[4] LSA-C.Cr.P. art. 434 provides in part:

Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. * * *