685 So.2d 237 (1996)
STATE of Louisiana
v.
Wilfred JOSEPH.
No. 96-KA-187.
Court of Appeal of Louisiana, Fifth Circuit.
November 14, 1996.
*239 Kurt F. Sins, Assistant District Attorney, Louis Authement, Assistant District Attorney, 29th Judicial District Court, Hahnville, for Plaintiff/Appellee.
*240 Gregory A. Miller, Norco, for Defendant/Appellant.
Before GAUDIN, C.J., and GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
Defendant, Wilford Joseph, appeals his convictions on three counts of distribution of cocaine, as well as his adjudication and sentence as a multiple offender. For the following reasons, we affirm the convictions and the adjudication as a multiple offender. We vacate the sentence and remand the matter to the trial court for re-sentencing.
Defendant was charged, by Grand Jury Indictment, with three counts of distribution of cocaine, in violation of LSA-R.S. 40:967 A(1). At his subsequent arraignment, defendant pled not guilty. The matter proceeded to trial before a twelve person jury, after which the defendant was found guilty as charged on all three counts.
Subsequently, the State filed a bill of information pursuant to the provisions of LSA-R.S. 15:529.1, seeking to have defendant adjudicated a multiple offender and sentenced accordingly. After a hearing on the matter, the trial judge found defendant to be a second felony offender and sentenced him to fifteen years at hard labor with credit given for time served. Following imposition of sentence, defendant moved for, and was granted, an appeal.

FACTS
The instant charges arise from three separate undercover narcotics transactions in January, 1994, two of which occurred on the same evening. The officers involved in the undercover operation of the St. Charles Parish Sheriff's Office, known as "Rock Video," testified at trial about the circumstances surrounding the three buys.
Detective David Gussman of the St. Mary Parish Sheriff's Department testified that in January of 1994, he was assigned to the St. Charles Parish Sheriff's Office to work in an undercover capacity purchasing narcotics. On January 13, 1994, he went to the S.I.D. (Special Investigations Division) office in Ama about 4:30 p.m., at which time video equipment was installed in his undercover vehicle, a Nissan pick-up truck. While there, Detective Gussman made contact with the St. Charles agents who would serve as control agents. After the video equipment was installed, he received funds to make the buys, and was equipped with a body mike (or transmitter), for safety purposes.
Officer Gussman set out with another officer at about 7:00 p.m. The officers' fourth contact that evening occurred on Good Children Street in Boutte, Louisiana sometime around 10:00 p.m. Detective Gussman was driving slowly down the street when he observed a subject walking in the area. The detective asked the subject if he knew where the officer could buy a "twenty." The subject, subsequently identified as the defendant, immediately approached the vehicle and inquired if the officers were the two who had been "ripped off" earlier that night at the end of the street. When Officer Gussman responded in the affirmative, defendant indicated that it was his cousin who "ripped them off". Defendant stated he would be willing to make it "good" for them if the officers would not hurt his cousin. Officer Gussman agreed to "call it even" if the defendant would fix him up with a good "twenty". Defendant had the officer pull the truck over to the left side of the road into a yard by a trailer. As the officer pulled into the yard, defendant approached the vehicle and removed some cocaine from under his shirt. Defendant went to the driver's side window and after they talked for a minute, the officer gave defendant the money, and in turn, defendant gave the officer the cocaine. The officer departed the area and when he was out of defendant's view, he placed the cocaine in a plastic bag and secured it on his person. After this buy was completed, Detective Gussman returned to the S.I.D. office, where he field tested, weighed, secured, and placed the evidence into the narcotics safe.
In conjunction with this officer's testimony, the videotape of the transaction was played for the jury. The officer testified that the video accurately depicted the events that occurred that evening. Detective Gussman made a positive identification of the defendant as the individual from whom he purchased *241 the cocaine. In addition, he was able to confirm the identification of defendant by viewing the video recording of the transaction. Detective Gussman also positively identified the crack cocaine as the narcotics he purchased from defendant on January 13, 1994.
Agent David Illg of the Plaquemines Parish Sheriff's Office testified that on January 19, 1994, he was assigned to the St. Charles Parish Sheriff's Office to make undercover narcotics buys. He went to the S.I.D. office in Ama, at which time video equipment was installed in his undercover vehicle. Wired with a transmitter, Agent Illg left the building with funds to make the buys and with instructions to go to different places within the parish. After Agent Illg made his first buy, he was instructed by his contact with the St. Charles Sheriff's Office, Agent Legendre, to go to a particular house on Good Children Street. When he pulled up to the front of the house and honked the horn, an unknown black male subject, later identified as Alcy Joseph, approached the track. The officer told this individual that he was looking for a "twenty," meaning a $20.00 rock of crack cocaine. After some discussion, Alcy Joseph got into the officer's vehicle and took him approximately two streets over to Leroy's Rock House. The officer gave Alcy $20.00, at which time Alcy walked over to defendant who was standing outside the bar. Both individuals walked towards the truck; however, defendant was very cautious and kept looking at the officer suspiciously, presumably because the officer did not frequent the area and defendant did not recognize him. Defendant got within ten feet of the front of the truck, and gave Alcy the crack cocaine. Alcy, in turn, gave defendant the money and then got into the truck and gave the officer the cocaine. The officer brought Alcy Joseph back to the house on Good Children Street. Before leaving, the officer pulled into the driveway and pretended to smoke the crack. When the officer left, he told Alcy that he was going to need some more "stuff" and Alcy told him that it would be okay for him to come back. Agent Illg departed the area and met with Agent Legendre at a pre-arranged location to view the videotape of the transaction. The officer then returned to the streets to make more narcotics purchases.
On his fourth buy of the evening, Detective Illg went back to Leroy's Rock House. As the officer pulled up to the bar, defendant, who was still standing on the corner, ran to the vehicle and asked the officer what he wanted. The officer told the defendant that he wanted a rock. The transaction was then made between the officer and the defendant at the car window. The officer departed the area and met with Agent Legendre at a prearranged location where the videotape was reviewed. After the officer made a fifth buy that night, he went to the S.I.D. unit in Ama where the evidence was field tested, weighed, put into envelopes and secured in the safe.
In conjunction with this officer's testimony, the State played the videos of these two transactions for the jury. The officer testified that the videos accurately reflected the events that transpired that evening. Although defendant was not captured on the first of the two transactions, the officer positively identified defendant in court as the individual involved in both narcotics purchases on the night of January 19th. He also identified the crack cocaine admitted into evidence as the narcotics he purchased from defendant on January 19th.
The substances which were purchased from defendant on January 13 and 19, 1994, were subsequently sent to the crime laboratory for analysis. The results of those tests, which were introduced into evidence at trial, proved positive for the presence of cocaine.
In five assignments of error, defendant seeks to have his convictions and sentence reversed.[1] In the first of those arguments, defendant challenges a ruling made by the trial court regarding the prosecutor's *242 opening argument. Specifically, defendant complains that the prosecutor, in his opening statement, improperly referred to a prior attempt by the undercover agent to make a purchase of narcotics which allegedly resulted in a simple robbery, and to the defendant's statement regarding the matter. The prosecutor, over defense counsel's objection, stated as follows:
MR. SINS:
The defendant comes up to the unit that Sergeant Gussman is in, and he's got another agent riding with him also at this time, for security purposes in this area. The defendant comes up and he's concerned at first, are you the dudes looking for the guys, were you ripped off just a little while ago, a couple of blocks down? They kind of infer yeah, they don't know exactly what he's talking about, and he's concerned about his cousin, who is also selling crack Cocaine, took some money and didn't give anybody their Cocaine and he's afraid that these two guys now are driving around looking to put some "hurt" on his cousin. And he brings that out. You'll hear the under-cover agent explain that to you.
He says, look, I'll make it up to you, and instead of just one rock, $20.00 rock for $20.00, one of the very few times, if you ever sit on a jury dealing with dope, he gives him two rocks, two $20.00 rocks, for $20.00, to kind of say, look, back-off my cousin. I'll take care of you. That's the first time, a block from Leroy's rock house and this happens right about 10:00 p.m. at night.
Defendant complains that the trial judge erred in allowing this argument as it constituted an impermissible reference to another crime, in violation of LSA-C.E. art. 404 B(1). Defendant also argues that there was no hearing, as required by State v. Prieur, 277 So.2d 126 (La.1973), to determine whether the other crimes evidence would have been admissible. Further, defendant asserts that the evidence could not be deemed admissible as part of the "res gestae" of any of the instant offenses. See LSA-C.E. art. 801 D(4).
LSA-C.E. art. 404 B(1) provides as follows:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The prohibition against other crimes pertains to other crimes by the defendant, not other crimes of someone else. State v. Olson, 503 So.2d 779 (La.App. 3 Cir.1987), writ denied, 508 So.2d 85 (La.1987); State v. Johnson, 529 So.2d 142 (La.App. 4 Cir.1988), writ denied, 535 So.2d 740 (La.1989). In the present case, the remark by the prosecutor does not constitute evidence of another crime committed by defendant, but refers to a narcotics sale committed by another individual. The State made no attempt to prove that the defendant herein had participated in the earlier narcotics transaction. Thus, the defendant's reliance on State v. Prieur, supra and LSA-C.E. art. 404 B(1) is misplaced. Neither of these provisions which concern the general prohibition against other crimes evidence are applicable to the instant situation. This assignment is without merit.
The second assignment concerns the propriety of the admission of physical evidence at trial. In this assignment, defendant argues that the cocaine should not have been admitted into evidence because it was not properly authenticated. He argues that there was insufficient evidence to show that state exhibits S-1, S-2, and S-3, are in fact the cocaine he allegedly sold to the undercover agents. Defendant bases this argument on the fact that Detective Sergeant George Breedy took the evidence home with him *243 overnight and stored it in an area accessible to a member of his family thereby breaking the chain of custody.
Article 901(A) of the Louisiana Code of Evidence establishes the general law relative to authenticity:
A. General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
In order to introduce demonstrative evidence at trial, the law requires that the object be identified. The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case. State v. Alexander, 621 So.2d 861 (La.App. 5 Cir.1993), writ granted and remanded for resentencing, 629 So.2d 376 (La.1993).
The identification may be visual, that is, testimony that the object introduced is one connected with the case, or through chain of custody, by tracing the object from the time it was seized to the time it was offered into evidence. State v. Sweeney, 443 So.2d 522 (La.1983); State v. Kelson, 94-263 (La.App. 5 Cir. 11/16/94), 646 So.2d 1049. A continuous chain of custody is not essential to enable the State to introduce physical evidence as long as the evidence as a whole establishes that it is more probable than not that the object introduced was the same as the object originally seized. State v. Matthews, 632 So.2d 294 (La.App. 1 Cir.1993). Once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to admissibility. State v. Sam, 412 So.2d 1082 (La.1982), appeal after remand, 478 So.2d 769 (La.App. 3 Cir.1985), writ denied, 483 So.2d 1019 (La.1986); State v. Kelson, supra. Ultimately, a chain of custody or connexity of the physical evidence is a factual matter for determination by the jury. State v. Myles, 616 So.2d 754 (La.App. 1 Cir.1993), writ denied, 629 So.2d 369 (La. 1993).
In the present case, despite the fact that Detective Breedy brought the evidence home the night before trial, the chain of custody was sufficiently established through the testimony of the police officers as they traced the narcotics from the time of seizure to the time it was offered into evidence. Detective Gussman testified that on January 13, 1994, after he made the buy from defendant, he placed the crack cocaine into a small plastic bag and secured it on his person until the end of the night. Since this was his last buy of the evening, he returned to the S.I.D. office where he field tested and weighed the evidence. He then placed the smaller plastic bag containing the cocaine inside another bag which he sealed on both ends. Gussman placed his initials over the seals and placed the evidence into the narcotics safe.
Agent Illg also testified regarding his procedure. After Agent Illg made the two buys, he put the narcotics into a small plastic bag which he marked according to the number of the buy that evening. He then secured the evidence on his person and after his fifth buy, he returned to the S.I.D. office at which time he weighed and field tested the evidence. He then placed the smaller bags which contained the cocaine into a larger bag which he sealed on both ends. Agent Illg placed his initials on the bag to signify that nothing else was put into the envelope or taken from the envelope. He then placed the envelope into the narcotics safe.
Detective Breedy testified in his capacity, as supervisor of narcotics for the St. Charles Parish Sheriff's Office, about the procedures used in securing evidence at the S.I.D. building in Ama. He testified that the building is secured by an alarm system, motion detectors, contacts on the windows and doors and glass breaking detectors throughout the building. In addition, there is a roller safe that weighs approximately 1,000 pounds which is bolted to the floor and is placed in the back office of the building. The safe is secured with two locks, and opening it requires two people. Breedy testified that, in this case, on May 2, 1994, he and another officer retrieved the evidence from the safe *244 and delivered it to the crime lab. As a means of tracing the evidence, it is then assigned a lab number in addition to the item numbers placed on the bags by the officers. Once at the lab, the evidence is opened and tested, and then resealed with the same type of evidence tape that was used on the envelope. The evidence is then picked up by the officers and placed back into the narcotics safe. In this particular case, on the night before trial, Detective Breedy retrieved the narcotics from the evidence safe at approximately 7:20 p.m. The evidence remained either in his direct possession or was secured at his residence which is also equipped with an alarm. At his residence, the evidence was placed in a floor safe in a separate room. He asked his wife, the only other person living at that residence, not to go into the room until the evidence had been retrieved for trial the next morning.
The officers also identified the evidence at trial as the narcotics they purchased from defendant on January 13 and 19, 1994. Furthermore, when Detective Breedy opened the envelopes in court, they were sealed with tamper resistant evidence tape.
Despite the fact that Detective Breedy brought the evidence to his house overnight, the State established that it was more probable than not that the objects introduced were the ones connected with the crimes. See State v. Merrill, 94-0716 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, writ denied, 95-0530 (La.6/23/95), 656 So.2d 1012, where the court concluded that it was more probable than not that the cocaine was connected to the officer's purchase from the defendant despite the gap in the chain of custody. See also State v. Sneed, 571 So.2d 735 (La.App. 2 Cir.1990). Accordingly, we find no merit in this assignment.
In his third assignment, defendant contends the trial court should not have allowed the State to introduce the scientific analysis reports over defendant's objections, because they did not conform to the requirements of LSA-R.S. 15:499. Specifically, defendant argues that the certificates do not comply with LSA-R.S. 15:499 A(5) because they do not state that the persons who signed the certificates are the same persons who performed the analysis. Defendant contends that if either the cocaine or the certificates of analysis had been properly excluded by the trial court, the State would have failed in its burden of proof.
LSA-R.S. 15:499 reads as follows:
All criminalistics laboratories established by laws of this state or by laws of the United States, and all coroners, forensic pathologists, and other persons, partnerships, corporations, and other legal entities practicing in fields of knowledge and expertise in the gathering, examination, and analysis of evidence by scientific means are authorized to make proof of examination and analysis of physical evidence by the certification of the person in charge of the facility in which such examination and analysis is made. Such certificate shall list:
(1) The date and time such evidence was delivered to such facility.
(2) The name of the person making such delivery, and the person receiving same.
(3) A brief description of the evidence.
(4) The type of examination or analysis requested.
(5) The name of the person making the examination or analysis.
(6) The date or dates of the examination of analysis.
(7) The results of the examination or analysis.
B. The certificate shall give the name and address of the facility in which the examination or analysis was made, and shall be signed by the person making the examination or analysis and by the person in charge of the facility.
The admissibility of these certificates is provided for in LSA-R.S. 15:500 which reads as follows:
In all criminal cases and in all cases in juvenile or family courts which are of a criminal nature, and in civil forfeiture proceedings arising from criminal activity, the courts of this state shall receive as evidence any certificate made in accordance with R.S. 15:499 subject to the conditions contained in this Section and R.S. 15:501. *245 The certificate shall be received in evidence as prima facie proof of the facts shown thereon, and as prima facie proof of proper custody of the physical evidence listed thereon from time of delivery of said evidence to the facility until its removal therefrom.
In our view, considering both paragraphs of LSA-R.S. 15:499, the certificates of analysis sufficiently complied with the requirements of the article. In light of Paragraph B of LSA-R.S. 15:499, we find it safe to conclude that the forensic chemist who signed the certificate is the one who performed the analysis. Moreover, Detective Breedy specifically testified that the signature at the bottom of the certificate is that of the chemist or forensic scientist who conducted the analysis, and is thereafter certified by the commander of the Louisiana State Police Laboratory. Consequently, we find no merit in this assignment.
In the fourth assignment, defendant argues that the trial court should not have allowed the in-court identification of defendant by Agent David Illg. At trial, defendant made an oral motion to suppress the incourt identifications of defendant by Officers Gussman and Illg. In asserting this motion, defense counsel argued that the officers' incourt identifications were tainted because the officers viewed the videotapes of the transactions prior to trial. After considering counsel's argument, the trial judge denied the oral motion to suppress the in-court identifications.
On appeal, defendant limits his complaint to the in-court identification of Agent Illg as it relates to the transaction where defendant was not captured on the videotape. Defendant now contends the trial court should have excluded Agent Illg's in-court identification of defendant because the viewing of the videotape immediately prior to trial was so suggestive that the in-court identification was unreliable and there was a substantial likelihood of irreparable misidentification.
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Pizzo, 575 So.2d 844 (La. App. 5 Cir.1991), writ application dismissed, 578 So.2d 919 (La.1991). However, even should the identification be considered suggestive, this alone does not violate due process, for it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. State v. Pizzo, supra.
With regard to in-court identifications, the standard to be used for determination of admissibility is whether, under the totality of the circumstances, the suggestive identification procedure led to a substantial likelihood of irreparable misidentification. State v. Jones, 94-1098 (La.App. 1 Cir. 6/23/95), 658 So.2d 307, writ denied, 95-2280 (La. 1/12/96), 666 So.2d 320.
In Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), the United States Supreme Court addressed this issue, stating as follows:
We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre and post-Stovall [v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)] confrontations. The factors to be considered are set out in Biggers. 409 U.S., at 199-200, 93 S.Ct., at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
In State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, ___ U.S. ___, 115 S.Ct. 450, 130 L.Ed.2d 359, rehearing denied, ___ U.S. ___, 115 S.Ct. 687, 130 L.Ed.2d 617 (1994), defendant objected to a prosecution witness's identification of him at trial, over a year and a half after the incident, as the man he saw running from the store on the night of the murder. Defendant claimed that the in-court identification *246 was tainted because before trial the witness had viewed two lineups and a videotape of the murder and had a fixed image of defendant's face. Defendant further argued that the witness lacked an independent source for the identification, and was able to identify defendant at trial primarily because his face was shown to the witness several times in the time between the murder and trial. The Louisiana Supreme Court affirmed the trial court's denial of the motion to suppress and agreed with the trial court's conclusion that the police acted properly, and did not present suggestive lineups. The Court in that case found that there was an independent basis for the witness's identification.
In the present case, during Agent Illg's testimony, he positively identified defendant as the individual involved in the two narcotics transactions on January 19, including the one where defendant was not captured on video. Since the videotapes were not provided to this Court, it is difficult to determine whether his viewing of the videotapes prior to trial resulted in a suggestive identification of defendant in court. However, even if the identification is considered suggestive, considering the Biggers factors, there was no substantial likelihood of irreparable misidentification. The officer testified that although he had not seen defendant before the buys, he has seen defendant around the bar on several occasions since January 19. Agent Illg further testified that although he viewed the video prior to his in-court identification of defendant, he did not rely on the video for his identification. During the first transaction with defendant on that evening, defendant was about fifteen feet away from Detective Illg's truck, affording the officer ample opportunity to view the defendant's face. The officer further testified that the area was well lit with several street lights and that the first transaction lasted between five and ten minutes. The officer saw defendant again that night when the two made a transaction at the officer's car window, thereby giving the officer another opportunity to view defendant. Moreover, defense counsel was given ample opportunity to cross-examine this witness in an effort to discredit his recollection of the incident.[2] In the present case, looking at the totality of the circumstances, the officer's identification testimony can be considered reliable. Further, defendant did not meet his burden of proving that there was a substantial likelihood of irreparable misidentification. This assignment is without merit.
In his final assignment of error the defendant raises a question as to the propriety of his adjudication as a second felony offender. He contends that the State failed to prove the second felony offender status. Specifically, defendant argues that the State introduced absolutely no proof that the five-year cleansing period had not elapsed as required by LSA-R.S. 15:529.1 C. In addition, defendant claims that the State did not make a prima facie showing that defendant was the same person convicted of the prior felonies. He also argues that the State did not comply with the provisions of LSA-R.S. 15:529.1(F) in that it did not produce the certificate of the warden, or anyone else, under seal of his office, with the fingerprints of the person convicted, nor did the State have any pictures of the convicted person.
In a multiple offender proceeding the State must prove, by competent evidence, the existence of a prior felony and that the defendant is the person who was convicted of that prior felony. State v. Chaney, 423 So.2d 1092 (La.1982); State v. Taylor, 93-226 (La. App. 5 Cir. 5/30/95), 656 So.2d 722. The State bears the additional burden of proving that the predicate convictions fall within the ten year cleansing period.[3] Evidence of the date of discharge for the prior sentence *247 is therefore an essential element of the habitual offender case. State v. Ellis, 94-599 (La.App. 5 Cir. 5/30/95), 657 So.2d 341, writ denied, 95-2095 (La.12/8/95), 664 So.2d 421, writ denied, 95-1639 (La.1/5/96), 664 So.2d 421.
Prima facie proof of a prior felony conviction may be established by compliance with LSA-R.S. 15:529.1(F). However, this provision is not the exclusive method of proving a prior felony conviction; any other competent evidence may be used to establish such proof. State v. Young, 27,237 (La.App. 2 Cir. 8/23/95), 660 So.2d 548.
In State v. Shelton, 621 So.2d 769 (La. 1993), the Louisiana Supreme Court revised the scheme of allocating burdens of proof in habitual offender proceedings. The court, in Shelton, stated as follows:
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. [footnote omitted] If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. If the State introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boykin rights. [footnote omitted] We note that this new procedure will not only give appropriate significance to the presumption of regularity which attaches to judgments of conviction which have become final, but will also provide an advantage to defendants who were previously under Lewis unable to introduce any extrarecord evidence and whose guilty pleas were heretofore under Tucker found constitutionally valid by mere proof of a minute entry and a guilty plea form.
State v. Shelton, supra at pp. 779-780.
See also LSA-R.S. 15:529.1 D(1)(b) which sets forth the burden of proof in habitual offender proceedings as follows:
(b) Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefore, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
On November 27, 1995, the State filed a bill of information seeking to have defendant adjudicated a second felony offender and sentenced accordingly. The matter came for hearing on December 20, 1995. At the hearing, the State introduced the following exhibits:
State Exhibit Number 1a copy of the indictment filed in connection with defendant's prior convictions. This indictment charged defendant with four counts of distribution of cocaine and one count of distribution *248 of marijuana. (District Court Case Number 89-0175).
State Exhibit Number 2a copy of the minutes taken in case number 89-0175. These minutes indicate that on January 8, 1990, defendant was present in court with his former attorney, was advised of his rights, waived his rights and pled guilty pursuant to a plea agreement. The minutes further show that he was sentenced to serve seven years, but that sentence was suspended. Defendant was thereafter placed on probation for five years, subject to various conditions, including that he serve one year in parish prison.
State Exhibit Number 3the plea agreement entered in case number 89-0175 signed by defendant, his attorney, and the trial judge.
State Exhibit Number 4another copy of the plea agreement in case number 89-0175, signed by defendant, his attorney, and the court.
State Exhibit Number 5a copy of the Boykin transcript taken on January 8, 1990 in case number 89-0175, showing that defendant was advised of his rights and that he waived those rights.
State Exhibit Number 6a copy of defendant's arrest report for the prior convictions, which includes a fingerprint card taken on the date of defendant's arrest, April 11, 1989.
State Exhibit Number 7a copy of the arrest reports involving the present charges, bearing arrest number 95-0762, which includes a fingerprint card taken on the date of defendant's arrest, April 10, 1995.
In addition to the introduction of the exhibits, Lieutenant Luis Mungia of the St. Charles Parish Sheriff's Office testified as an expert in the field of fingerprint identification. Mr. Mungia testified that he fingerprinted defendant that morning and that he had the opportunity to compare that fingerprint card (State Exhibit Number 8) with the other fingerprint cards introduced into evidence, bearing arrest dates of April 10, 1995 and April 11, 1989. His comparison revealed that they belonged to the same individual.
After considering the evidence presented, the trial judge found that the State met its burden of proof and thereafter sentenced defendant as a second felony offender to 15 years at hard labor with credit given for time served.
In the present case, the State presented ample evidence to prove the existence of a prior felony and that defendant was the person who was convicted of that prior felony. Regarding the discharge date, the documentary evidence introduced showed that the ten year cleansing period provided in LSA-R.S. 15:529.1C had not expired. See State v. Walter, 615 So.2d 1023 (La.App. 1 Cir.1993), writ denied, 619 So.2d 543 (La.1993), where the court noted that the documentary evidence introduced established that the defendant committed the three Texas felony convictions and the instant conviction within a period of five years and therefore, evidence as to the defendant's discharge dates from prison was unnecessary.
Considering the documentary evidence and the expert fingerprint testimony, the State introduced sufficient proof of defendant's status as a second felony offender under LSA-R.S. 15:529.1. Accordingly, this assignment is without merit.
Upon a review of the record for errors patent, we note that the trial judge imposed only one sentence, whereas defendant was convicted of three separate offenses. The trial court must impose a separate sentence for each separate count on which the defendant was convicted. Patent sentencing error occurs when a trial court, in sentencing for multiple counts, does not impose a separate sentence for each count. State v. Soco, 94-1099 (La.App. 1 Cir. 6/23/95), 657 So.2d 603. We are aware of the exception to that rule in State v. Batiste, 517 So.2d 371 (La.App. 5th Cir.1987), in which this Court has upheld a single sentence for convictions on multiple counts in instances where the sentences for a conviction on each count would more appropriately be concurrent rather than consecutive, and the term of imprisonment is reasonable. However, we do not find that exception applicable in this case.
C.Cr.P. art 883 provides in pertinent part: *249 If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
In this case, we find the three counts on which the defendant was convicted involved three distinct drug transactions which are not part of a common plan. See, State v. Scott, 26-199 (La.App. 2 Cir 8/19/94), 641 So.2d 1091. Therefore, the sentences should be served consecutively and each must be the subject of a separate sentence. Accordingly, we affirm the convictions, but vacate the sentence and remand the matter to the trial court for resentencing.
CONVICTIONS AFFIRMED; SENTENCE VACATED; MATTER REMANDED.
CANNELLA, Judge, concurring in part and dissenting in part.
I agree with the conclusion reached in this case that it should be remanded for resentencing. However, I disagree that the sentences arising from separate acts or transactions must be served consecutively. The trial judge has discretion to order the sentences served concurrently or consecutively under La.C.C.P. art. which specifically states:

Art. 883. Concurrent and consecutive sentences
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Thus, I concur with the decision to remand for resentencing and dissent from the conclusion that the sentences must be served consecutively.
NOTES
[1] Defendant listed nine assignments of error in accordance with LSA-C.Cr.P. art. 841. However, only five of those assignments were argued on appeal. We will discuss those five and deem the others abandoned. Assignments of error neither briefed nor argued are considered abandoned pursuant to Uniform Rules of Court-Courts of Appeal, Rule 2-12.4. State v. Bruce, 556 So.2d 129 (La.App. 5 Cir. 1990), writ denied, 561 So.2d 114 (La.1990).
[2] If the defense is allowed ample opportunity to cross-examine the witness, there is usually ample opportunity to remedy any suggestiveness in the identification. State v. Evans, 512 So.2d 615 (La.App. 2 Cir. 1987), writ denied, 516 So.2d 367 (La.1988).
[3] Although the statute previously provided for a five year cleansing period, Acts 1994, 3rd Ex. Sess. No. 85, which became effective August 27, 1994, amended subsection C, increasing the section's application from a maximum of five years to a maximum of seven years. This subsection was again amended by Acts 1995, No. 839, Sec. 1, which became effective August 15, 1995, to increase the period from seven to ten years. In the present case, the multiple bill was filed in November of 1995.