871 So.2d 536 (2004)
STATE of Louisiana
v.
Quindale ADDISON.
No. 03-KA-1421.
Court of Appeal of Louisiana, Fifth Circuit.
March 30, 2004.
*538 Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Defendant-Appellant, Quindale Addison.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Juliet Clark Terry M. Boudreaux, Assistant District Attorneys, Appellate Counsel, Gretna, LA, for Plaintiff-Appellee, the State of Louisiana.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Quindale Addison appeals his conviction of distribution of cocaine, asserting that the trial court erred in removing defendant from the courtroom during his trial and that the evidence was insufficient to support the conviction. We affirm.
On December 4, 2002 Quindale Addison was charged with one count of possession of cocaine with intent to distribute, later amended to charge him with one count of distribution of cocaine. Both offenses are violations of La.R.S. 40:967(A).[1] Defendant entered a plea of not guilty on February 25, 2003. On the same date the trial court denied his motion to suppress identification.
On April 22 and 24, 2003, the case was tried before a 12-person jury. On the second day of trial, the judge held defendant in contempt of court, ordered him to serve six months in parish prison, and directed that he be removed from the courtroom. The trial continued in his absence and the jury returned a verdict finding defendant guilty as charged.
On May 13, 2003, the trial court sentenced defendant to imprisonment at hard labor for ten years, with the first two *539 years of the sentence to be served without benefit of parole, probation, or suspension of sentence. Defendant made a timely motion for appeal.
On June 12, 2003, the State filed a habitual offender bill, alleging defendant was a third-felony offender. Defendant denied the allegations of the multiple bill and filed a response. On October 8, 2003, however, defendant stipulated to the multiple bill. On that same date, the trial court vacated the original sentence and sentenced defendant to imprisonment at hard labor for 20 years without benefit of probation or suspension of sentence.[2]

FACTS
Jefferson Parish Sheriff's Office narcotics agent Wally Davis testified that on October 16, 2002, he was case agent on an investigation of complaints about drug activity in the Friedrichs Street area on the West Bank of Jefferson Parish. He sent undercover agent Alan James to make drug buys in the neighborhood. Davis was part of the cover team for Agent James, who drove an unmarked vehicle equipped with audio and video equipment to record the transactions.
Davis identified State's Exhibit 2 at trial as the rock of cocaine pertaining to this case. He testified that the cocaine inside the bag bore the same item number as the currency used to purchase the drugs and the videotape of the transaction. On cross-examination, Davis testified that the rock of cocaine was wrapped in a small plastic bag when it was purchased, and that he took the rock of cocaine out of the bag, cut a little piece off of it, field-tested it, put it in a bag, logged it into evidence, and sent it to the lab for additional testing.
Agent Davis identified State's Exhibit 3 as a photocopy of the currency the officers gave James to purchase narcotics that day. He said officers did not recover money on the same date because the arrest was not made that day.
Davis identified State's Exhibit 4 as the videotape of the transaction and said that when he first viewed the videotape he did not know the identity of the individual who distributed narcotics. Approximately one week later, officers interviewed some people in the neighborhood, who gave them a name that fit the description of the person they were seeking. Based on information Davis received, he compiled a photographic lineup on October 23, identified as State's Exhibit 5.
Davis acknowledged that at earlier proceedings he had testified that he saw defendant at the time and that defendant was the same person whose photograph was placed in the photographic lineup as number 5. Davis said he showed the photographic lineup to Agent James on October 23 and James immediately picked out photograph number 5 without hesitation.
Davis testified that James viewed the videotape on October 16, the day of the transaction, and that Agent James could have seen the videotape on October 23 when he showed James the photographic lineup. After the identification, they obtained a warrant for defendant's arrest.
Jefferson Parish Sheriff's Office undercover narcotics agent Alan James testified that on October 16, 2002 at 3:24 p.m., he purchased drugs from an individual later identified as Quindale Addison. The jury viewed a videotape of the transaction. During the playing of the videotape, which *540 had no audio track, the prosecutor questioned Agent James regarding the tape's contents.
James identified himself as the driver of the vehicle shown on the tape, which was made on a video camera hidden in the vehicle. He explained that he drove through the neighborhood in the area of Friedrichs, Nel and Ruby streets on the Jefferson Parish West Bank. As he drove, he attempted to attract attention of residents by holding up one finger to indicate he wanted to buy one rock of crack cocaine. When he saw defendant, James asked him for a "twenty," which meant he wanted to buy $20.00 worth of crack cocaine.
Defendant then asked him to step out of the truck. James thought it was because defendant suspected he was the police and had cameras in the car. James said defendant then looked in his vehicle for cameras. According to James, defendant told him that if he was the police, he was going to kill him. Defendant then left the vehicle to get the crack cocaine, came back and gave James an off-white rock-like object. James gave defendant the money as soon as defendant gave him the drugs. Defendant told James instead of coming back the next time he wanted to buy drugs, to call him on his cell phone. At that point the videotape ended.
James testified he had an opportunity to get a good look at defendant's face and he looked at him for approximately five to seven minutes. He identified State's Exhibits 9 and 10 as still photographs taken from the videotape and testified that defendant was the individual he from whom he purchased the cocaine. James identified State's Exhibit 5 as the photographic lineup he was shown on October 23. He said he picked out photograph number 5 as the individual who sold him the drugs on October 16.
James also stated that he had seen defendant when he testified previously in this case and that defendant was the individual who sold him the drugs on October 16. James testified he viewed the videotape on the day of the transaction, October 16, and again prior to viewing the photographic lineup on October 23. He explained he identified defendant from the photographic lineup because defendant was the individual who sold him the cocaine, and not because he had seen defendant in the videotape.
James identified State's Exhibit 2 at trial as the drugs defendant sold to him. He testified they bore the same item number "as this entire case." He testified he did not believe the rock of cocaine was wrapped when he purchased it. He said he put the rock of cocaine inside the evidence bag, but he did not put the rock of cocaine inside the other little plastic wrapping. He opined that the crime lab wrapped the cocaine in the other plastic wrapping because "[i]t's got the same initials." James explained that after he purchased the rock, he put it inside the evidence bag and sealed it.
The State and the defense stipulated to State's Exhibit 1, the lab report, which showed that Andrea K. Travis tested the rock-like object in connection with this case and that it tested positive for cocaine. They also stipulated that State's Exhibit 2 was the rock of crack cocaine that was tested.
The defense rested without calling any witnesses.
At the conclusion of the trial, the jury found defendant guilty as charged.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the trial court erred in removing him from the courtroom during *541 his trial. He argues that his removal constituted reversible error.
At issue is the following sequence of events and dialogue, as set out in the transcript.
On April 22, 2003, the first day of trial, prior to jury selection defendant's appointed trial attorney (Frazilia Wiggins) informed the court that she wanted to make a note of evidence. She then took testimony from defendant, her client, which established that on February 13, on February 24, and again on April 22,2003 defendant was offered 15 years on a multiple bill, but each time defendant declined and told her he wanted a trial. In addition, defense counsel stated that defendant had advised her he wanted to hire a private attorney. Defendant testified that he wanted to go to trial with his own attorney, and that he understood he could get up to 60 years.
The following colloquy then took place between the judge and defendant:
THE COURT:
All right. The Court has previously delayed these proceedings to allow you an opportunity to hire private counsel.... And, that did not take place. And, so, this matter is now ready to proceed on. I am not going to allow any further delays in this trial. To do so would permit you to manipulate the Court. And the Court feels very strongly at this point that that is exactly what is happening. I have allowed sufficient time for you to do what you want to do. That simply hasn't occurred and today is the day that we will proceed to trial. Do you understand that?
MR. ADDISON (THE DEFENDANT):
No, sir, Your Honor.
* * *
Yesterday I was brought into court yesterday [sic], unnotified, nobody in my family notified.... Even this morning, due to the technical difficulties in the jail, no phones was working in the jail.
I went offshore and I got documents to show that I wanted to hire a lawyer, Your Honor....
THE COURT:
Stand up, sir, as you address the Court. Stand up.
MR. ADDISON (THE DEFENDANT):
Due to the technical difficulties ... no phones were active, so I couldn't contact no lawyer. But I woulda [sic] had a lawyer in here this morning ... but I had no way to get in touch with nobody, no family members or nobody....
THE COURT:
What lawyer is it that you wanted to have in here this morning, sir, that you were unable to contact?
MR. ADDISON (THE DEFENDANT):
I was trying to contact [names two attorneys].
THE COURT:
So, prior to yesterday you had not contacted any of those persons?
MR. ADDISON (THE DEFENDANT):
I had just come from offshore, Your Honor, I got documents to show I was offshore.
THE COURT:
I am well aware that there are telephones that are available offshore, sir.
My question to you is, whether or not, prior to yesterday, you had made an effort to hire the attorney. That was a very simple question.
MR. ADDISON (THE DEFENDANT):
No, sir, Your Honor.
* * *
I never knew I was coming to court, neither, Your Honor.
THE COURT:

*542 Well, you know, the matter is this, sir: The last time you were here, your trial was continued. It was continued to today. So, in fact, you knew. You were present in open court when that occurred.
And, if you are going to decide to wait until the day before trial to make these efforts, then you do so at your own peril. Those are the choices you make, sir.
MR. ADDISON (THE DEFENDANT):
Your Honor, I wasn't never continued because a lawyer was hired. I bonded out and I went offshore upon bonding out to get me some money to obtain me a lawyer.
THE COURT:
Mr. Addison, I say to you again: When this trial was continued, you were present. You knew when the case was reset to. This matter has been pending since December of 2002 and you have yet to bring in a new lawyer. This is April, on the verge of May, sir. This case is set for trial and it's going today.
And, yesterday was not sufficient time for you to bring a lawyer in here to try a case on your behalf. And, to put a lawyer in a position like that at the last moment would just require him to commit malpractice.
That is all, sir. You may be seated.
The trial judge then asked the deputy to bring the prospective jurors in. Defense counsel asked to approach the bench. The trial judge took a brief recess and the jurors exited the courtroom. The following exchange ensued:
THE COURT:
All right. It's my understanding, Mr. Addison, you wish to proceed to trial. Is that correct?
* * *
MR. ADDISON (THE DEFENDANT):
Yes, sir.
THE COURT:
I have also been informed that you have conducted yourself in an improper manner in this courtroom.
Stand up, sir, when I speak to you.
Let me assure you of one thingand take your hands out of your pocketMr. Addison, you will never use profanity in this courtroom again. If you do, I will hold you in contempt, sir.
Let me also assure you that the law provides that you are to be present at these proceedings. And I have said to you before, you will be present so long as you conduct yourself properly.
Conducting yourself properly means that you do so when I am on the bench and when I am not on the bench. When I am not on this bench in this courtroom, this is still my courtroom and my rules still govern.
Notwithstanding that you may be upset, there is a way to always present yourself. And, when you present yourself properly, even though you may feel that you have not gotten what you want, you help your cause. When you present yourself improperly, you merely expose the true innersides of you and that does not help your cause.
Do you understand that?
MR. ADDISON (THE DEFENDANT):
Yes, sir.
THE COURT:
And I want you to understand that whatever you say to people in this courtroom impacts this judge because this is my courtroom. It is a public forum, and I will not tolerate any misconduct concerning this courtroom....
Do you understand me very clearly, sir?

*543 MR. ADDISON (THE DEFENDANT):
Yes, sir.
THE COURT:
Also, understand this: If you believe that you have not received justice or that you have not been treated properly by any party, and that includes this judge, you have rights that are available to you under law that you can exercise.
It doesn't help you when you begin to create disturbance and present yourself in a manner that's inappropriate.... And when you conduct yourself in that fashion you don't help your cause at all.
* * *
All right. Do you have any questions as to how you are to present yourself?
MR. ADDISON (THE DEFENDANT):
Yes, sir. I mean, you force me to go to trial without an attorney.
THE COURT:
Well, I'm not going to revisit that. I have made my decision on that and
MR. ADDISON (THE DEFENDANT):
I have a decision, too, Your Honor.
THE COURT:
Stand up, sir. You don't sit down until I've finished.
I have made my decision on that and you can either
MR. ADDISON (THE DEFENDANT):
That's not
THE COURT:
Listen to me. Don't interrupt me, Mr. Addison. You either stand up and be a man or you react as a child. Those are the choices you have. And if you want to act as a child and misbehave in this courtroom because you don't agree with the ruling of this Court, then you don't help your cause.
A man can stand up and say, "I don't have what I want but I'm going to go through this process and I know what I have available to me afterwards." That's what I tried to explain to you. And, that's what I expect from you, sir. I expect nothing less.
The prospective jurors then came back into the courtroom and the case proceeded. Jury selection began. The court broke for lunch and a recess and then resumed voir dire.
After the jury was chosen, the State gave its opening statement; the defense waived its opening statement. The prosecutor and defense counsel stipulated that State's Exhibit 1 was the lab report indicating that the rock-like object in connection with this case tested positive for cocaine, and that State's Exhibit 2 was the rock of cocaine that was tested. Both exhibits were published to the jury.
The trial judge then informed the jury that the trial would resume on the day after the next day and he adjourned court.
On April 24, 2003, the second day of trial, the jurors entered the courtroom, but the trial judge asked them to retire to the jury room. The following exchange took place:
THE COURT:
Let the record reflect that Counsel for the Defendant had approached the Court and has indicated that there was a disturbance between herself and her client.
Ms. Wiggins, what is taking place?
MS. WIGGINS:
Your Honor, my client is being uncooperative. He is being verbally abusive. He is not listening to the advice that I'm giving him. And at this point, I'm scared of his behavior that something might happen.
THE COURT:

*544 In what manner is he being verbally abusive, specifically?
MS. WIGGINS:
The way that I'm handling the trial, that something is going to happen and that this trial is going to stop today and will be continued, is one of the statements that he just made to me prior to the jury coming in, and I don't know what that something is.
THE COURT:
You are telling me that you feel that he is threatening you?
MS. WIGGINS:
Yes, sir. My interpretation of what he said, "Something is going to happen and this trial will be continued."
THE COURT:
What relief are you seeking?
MS. WIGGINS:
Well, at this point I feel that I need some protection from the Court because if he does anything over here, I am going to have to retaliate. I am not going to let my client do something to me and I just sit here. That will not happen. Several times he told me that I should be sitting on the other side with the D.A. And the things that I am suggesting to him that he needs to do in this courtroom, he is not following. He is not following my advice on the things that we need to do in this courtroom.
The trial judge took a recess to see counsel in chambers. The judge ordered that defendant be restrained while he was in chambers. When the judge returned to the bench and reconvened court, he stated:
THE COURT:
Let the record reflect that the Court has considered this matter in chambers, and I note the jurisprudence of this State which gives the Court wide discretion in terms of maintaining order in the courtroom.
The record should reflect that on yesterday, this judge warned this defendant concerning his disruptive behavior. I am now informed by an officer of this Court, who is his counsel, duly appointed at his request to represent him during the course of this trial, that he has in fact threatened her.
I have considered the options that might be available to the Court:
First, to bind and gag the defendant.... I find that would not be appropriate because it would be evident and obvious to the jury.
The other option is to cite the defendant for contempt. A contempt citation would serve no purpose because the defendant is already incarcerated.
The third option available to the Court is to remove the defendant from the courtroom. I have previously warned him on yesterday concerning the possibility of his removal. Yet, in spite of that, I am informed by an officer of this court that that has in fact occurred.
I have not inquired of the defendant as to what has taken place because the Court views a threat of physical harm as a criminal violation and, therefore, there are constitutional rights concerning that matter.
I do find that that conduct is disruptive of these proceedings. The Court is unable to continue on with that type of conduct.
I note, in particular, that counsel is a female involved, but that would not make a determination in the outcome of its decision. I note the defendant is a male, substantially larger and generally recognized as being more powerful than his attorney, and any option that I will considerplacing police officers between *545 them and so forthwould simply not work.
And, therefore, the Court is going to order the defendant's removal from this trial. I find that his conduct is disruptive; that he is not amenable to the instructions which I have previously given him to him, and exercise its discretion as provided to it. I find further, because of his threats against his lawyer, that she is not able to get close and confer with him and, therefore, he is preventing the trial from going forward by virtue of that conduct....
MR. ADDISON (THE DEFENDANT):
Y'all reckon I'm supposed to go to trial with this
THE COURT:
Mr. Addison
MR. ADDISON (THE DEFENDANT): attorney.
THE COURT:
I have not given you permission to speak, sir. I want that on the record. You are again disrupting the Court.
MR. ADDISON (THE DEFENDANT):
You are forcing me to go to trial with this
THE COURT:
Mr. Addison, I have given you instructions
MR. ADDISON (THE DEFENDANT): lawyer, and I want what I say on the record, too.
THE COURT:
All right. You are in contempt of court. I sentence you, additionally, to six months in the parish prison.
Defendant again complained, "You are forcing me to go to trial with this lawyer," and then was escorted from the courtroom. In a sidebar conference the judge informed counsel he was not going to speak to the jury concerning the defendant's absence. After discussion with the prosecutor, the trial judge agreed it would be sufficient for the State to base any identification testimony on identifications made at earlier hearings.
Defense counsel said she had a "mental dispute with that." A matter unrelated to defendant's trial was subsequently taken up. The judge then continued with defendant's trial. Prior to the jury coming back into the courtroom, defense counsel made objection on behalf of the defendant to his being removed from the courtroom.
During the jury instructions, the trial judge took a recess, then reconvened and, outside the jury's presence, made the following statement:
THE COURT:
Let the record reflect the Court, on its own motion, is concerned regarding the absence of the defendant and the jury having observed same, and is concerned that the jury should be instructed on how they ought to treat his absence.
I have conferred with counsel and have proposed the following language:
"Ladies and gentlemen, you are not to consider the defendant's absence during these proceedings as evidence in this case. The only evidence which you are to consider is that which has been admitted during the course of the trial."
The judge then asked the State and defense counsel whether they had any objections and both responded, "No objection, Your Honor." The judge subsequently read that instruction to the jury.
On appeal defendant contends that no efforts were made by the court or his counsel to communicate with him after his removal and that he was not questioned regarding his right to testify. He asserts that the record fails to show he *546 was initially disruptive. Defendant argues further that the trial court erred by not holding a hearing to examine his counsel's accusations against him. He contends his actions were not the type of conduct that warranted the denial of his constitutional right to be present in the courtroom at every stage of the proceeding.
The State responds that the record as a whole supports the trial court's determination that defendant was intent upon disrupting the proceedings and that the situation could not be addressed in any other fashion.
La.C.Cr.P. art. 831 provides for a defendant's presence at trial when the prosecution is for a felony, as follows in pertinent part:
A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
* * *
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced....
However, exceptions to this rule are provided in La.C.Cr.P. art. 832:
A. A defendant initially present for the commencement of trial shall not prevent the further progress of the trial, including the return of the verdict, and shall be considered to have waived his right to be present if his counsel is present or if the right to counsel has been waived and:
(1) He voluntarily absents himself after the trial has commenced, whether or not he has been informed by the court of his obligation to be present during the trial; or
(2) After being warned by the court that disruptive conduct will cause him to be removed from the courtroom, he persists in conduct which justifies his exclusion from the courtroom.
The Confrontation Clause of the Sixth Amendment of the U.S. Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him; the Fourteenth Amendment makes the guarantee of confrontation and cross-examination obligatory upon the states. Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).
One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of the trial. State v. Shank, 448 So.2d 654, 657 (La.1984). The same right is embodied in Article 1, Section 16 of the Louisiana Constitution of 1974. Id.
The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *" [T]he Fourteenth Amendment makes the guarantees of this clause obligatory upon the States.... One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.
Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). *547 The right of confrontation is not absolute, however:
[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.
Allen, 397 U.S. at 343, 90 S.Ct. at 1060-1061.
In Allen, the Supreme Court recognized that "dignity, order, and decorum" in the courtroom are "essential to the proper administration of criminal justice" and that "flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." Id.
We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.
Allen, 397 U.S. at 343-344, 90 S.Ct. at 1061.
In State v. Peralta, 01-149, p. 21 (La. App. 5 Cir. 1/15/02), 807 So.2d 967, 977, writ denied, 02-541 (La.1/24/03), 836 So.2d 41, this Court found no error in the trial judge's removal of the defendant from the courtroom after numerous warnings regarding his obstructive behavior. We found that the trial judge went to great lengths to determine the defendant's wishes, that the defendant continued to maintain his desire to leave the courtroom and essentially pressured the court into removing him by threatening to disrupt the proceedings, and that the trial judge ensured that the defendant had not changed his mind about returning to court. Based on those circumstances, we concluded that the trial judge had not abused his discretion in ordering the defendant removed from the courtroom.
In State v. Langley, 95-1489, p. 23 (La.4/14/98), 711 So.2d 651, 668, our supreme court upheld the trial court's removal of the defendant from the courtroom. The court found that the defendant's conduct was disruptive enough to warrant the trial judge's response, that provisions were made for the defendant to participate in the trial to the maximum extent his own misconduct would allow and, therefore, that the trial judge had not erred in removing the defendant from the courtroom.
In State v. Lee, 395 So.2d 700 (La. 1981), and State v. Rochon, 393 So.2d 1224 (La.1981), the supreme court upheld convictions where the defendants were removed from the courtroom for disruptive behavior and placed in adjoining rooms where they were able to hear the remainder of the proceedings. In State v. Riles, 355 So.2d 1312 (La.1978), the supreme court found that no error or abuse was shown by the trial court's removal of the accused from the courtroom after he cursed the judge and struggled with the sheriffs and otherwise disrupted the trial, with the court repeatedly offering the accused the right to return if he promised to behave (which he would not).
In the instant case, the record indicates that defendant's conduct was disruptive to the proceedings. Defendant continued to argue with the trial judge regarding hiring *548 private counsel, even though the trial judge had already ruled on the matter. After a recess, the trial judge was advised by defense counsel that defendant used profanity in the courtroom. Defendant failed to stand up numerous times after being instructed by the trial judge. The trial judge told defendant that he would be allowed to be present at the proceedings as long as he conducted himself properly. The following day, the trial judge was advised by defense counsel that defendant was being verbally abusive and had threatened her, and that she was frightened by his behavior and afraid that something might happen.[3]
In light of the foregoing, we find that the trial court did not abuse its discretion in removing defendant from the courtroom.
Defendant also argues that the trial court erred by failing to conduct a hearing regarding his counsel's allegations. We find no merit to that argument, either. As discussed above, the trial judge considered the possibility of a hearing to ask defendant what had taken place between him and his counsel, but the judge rejected that option because he viewed the threat of physical force as a criminal violation, so that defendant's constitutional rights were involved (e.g., right against self-incrimination). Moreover, the trial judge personally observed defendant's disruptive behavior.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment defendant asserts the evidence was insufficient to support this conviction.
Defendant argues that the identification was unduly suggestive because the agent who made the identification viewed the videotape of the transaction prior to the photographic lineup and, therefore, the identification should have been suppressed. He contends that the evidence was insufficient to support the conviction because the testimony of the two agents was contradictory with respect to when the videotape was viewed.
Defendant also contends that the evidence was insufficient to support the conviction because it failed to show that State's Exhibit 2 was in fact the cocaine he allegedly sold to the undercover agent. He bases this argument on the contradictory testimony of Agents Davis and James regarding the way the cocaine was packaged when it was purchased.
The State responds that there was no reasonable likelihood of misidentification and that Agent Davis and Agent James both identified State's Exhibit 2 as the rock of crack cocaine Agent James purchased from defendant. Thus, the State contends, evidence was sufficient to support the conviction.
The record does not show that defendant filed a motion for post-verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821. However, such failure does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982).
The constitutional standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 *549 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing all of the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See State v. Bishop, 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437.
Defendant was convicted of violating La. R.S. 40:967(A), distribution of cocaine. Pursuant to that statute, the State was required to prove that defendant knowingly or intentionally distributed cocaine. See State v. Raines, 00-1941, p. 7 (La.App. 5 Cir. 5/30/01), 788 So.2d 635, 640, writ denied, 01-1906 (La.5/10/02), 815 So.2d 833.
On appeal, defendant only challenges the identification procedure and the sufficiency of the evidence with respect to the agents' contradictory testimony regarding the viewing of the videotape and the packaging of the cocaine.

Identification
Defendant argues that the identification was unduly suggestive and tainted because Agent James viewed the videotape of the transaction prior to looking at the photographic lineup and, therefore, the identification should have been suppressed.
In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Clennon, 98-1370, p. 6 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Id.
At the suppression hearing, Agent James testified that on October 16, 2002 he purchased a rock of crack cocaine from defendant, whom he positively identified in court. Agent James further testified that on October 23, 2002 Agent Davis showed him a photographic lineup that he identified as State's Exhibit 1. Agent James explained that Agent Davis did not force him to pick out anyone, coerce him, or promise him anything of value. Agent James picked out defendant's photograph, number 5, as the subject who sold him the crack cocaine on October 16, 2002. He testified that he had never seen defendant prior to that date.
Agent James acknowledged that he viewed defendant's face approximately two or three minutes when he purchased the cocaine. He testified at the suppression hearing that he looked at the photographic lineup before he looked at the videotape (of the transaction). After hearing the testimony, the trial judge denied the motion, stating that there was no constitutional violation in the manner by which the photographic identification took place.
Agent James testified at trial, and his testimony was very similar to his testimony at the suppression hearing with two exceptions. First, Agent James testified at trial that he looked at defendant's face for approximately five to seven minutes. In contrast; at the suppression hearing he testified that he looked at defendant's face for approximately two or three minutes when he purchased the cocaine.
Secondly, Agent James testified at trial that he viewed the videotape of the transaction on October 16, the day of the transaction, and on October 23, prior to viewing the photographic lineup. However, at the suppression hearing he testified that he looked at the photographic lineup before he looked at the videotape. He testified at trial that he identified defendant from the photographic lineup because defendant was the individual who sold him the cocaine, and not because he had seen defendant in the videotape.
*550 Agent Davis testified at trial that he did not believe Agent James viewed the videotape on October 23 when he showed him the photographic lineup, but that he could have done so.
In State v. Payne, 00-1171, pp. 5-6 (La. App. 5 Cir. 12/13/00), 777 So.2d 555, 558-559, writ denied, 01-118 (La.11/21/01), 802 So.2d 626, this Court set out the law regarding identification procedures:
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure.... However, even should the identification be considered suggestive, this alone does not violate due process, for it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure.
Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The factors to be considered in assessing reliability were initially set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and approved in Manson v. Brathwaite, supra. They include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and, (5) the time between the crime and the confrontation.
Any corrupting effect of a suggestive identification procedure is to be weighed against these factors.... Finally, in evaluating a challenge to an identification procedure, courts must consider the totality of the circumstances to determine whether an identification presents a substantial likelihood of misidentification.
Here, Agent James testified at trial that he identified defendant from the photographic lineup because defendant was the individual who sold him the cocaine, and not because he had seen defendant in the videotape. The transaction occurred during daylight hours, as was evidenced by the videotape and by Agent James' testimony that the transaction occurred at 3:24 p.m.; the officer was in close proximity to defendant and had a clear view of him, which was also evidenced by the videotape; the time between the transaction and the identification was relatively short (one week); the sale was recorded on videotape, which was played for the jury at trial; and defense counsel was given an opportunity to cross-examine Agent James in an effort to discredit his identification.
Given these circumstances, after reviewing the factors set forth in Manson v. Brathwaite, supra, as well as the totality of the circumstances, we find there was not a substantial likelihood of misidentification and, thus, the trial court did not err in denying defendant's motion to suppress. See also, Payne, supra; State v. Pugh, 99-851 (La.App. 5 Cir. 12/21/99), 750 So.2d 313, writ denied, 00-206 (La.8/31/00), 766 So.2d 1273, overruled on other grounds by State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790.

Videotape
Defendant argues that the testimony of Agent James and Agent Davis was not credible because they contradicted each other as to when the videotape was viewed by Agent James.
Although there was some question as to whether the videotape was viewed either before or after the photo lineup, that *551 discrepancy appears to be irrelevant to the jury's verdict since the jury only heard the trial testimony, which was consistent. Because the jury did not hear the contradiction between the testimony at trial and at the suppression hearing, and because the trial testimony was fairly consistent, it could not have affected their guilty verdict.
In addition, in reaching the guilty verdict the jury obviously found the State's witnesses to be credible. In State v. Deruise, 98-0541, p. 26 (La.4/3/01), 802 So.2d 1224, 1243, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001), the Louisiana Supreme Court reiterated, "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness."
It is not the function of the appellate court to assess credibility or reweigh the evidence. State v. Hotoph, 99-243, p. 12 (La.App. 5 Cir.11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Under the circumstances, we find that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant was guilty of distribution of cocaine.

Packaging of cocaine
Defendant argues there was insufficient evidence to show that State's Exhibit 2 was in fact the cocaine he allegedly sold to the undercover agent. He bases this argument on the contradictory testimony of Agent James and Agent Davis regarding the way the rock of cocaine was packaged when it was purchased. Although defendant did not object to the admissibility of the cocaine, he is arguing that the evidence was insufficient to show that State's Exhibit 2 was in fact the cocaine he allegedly sold to the undercover agent.
A continuous chain of custody is not essential to enable the State to introduce physical evidence as long as the evidence as a whole establishes that it is more probable than not that the object introduced was the same as the object originally seized.... Once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to admissibility.... Ultimately, a chain of custody or connexity of the physical evidence is a factual matter for determination by the jury. [Citations omitted.]
State v. Joseph, 96-187, p. 9 (La.App. 5 Cir. 11/14/96), 685 So.2d 237, 243, writ granted in part on other grounds, denied in part, and remanded for resentencing, 96-2998 (La.5/9/97), 693 So.2d 782.
Even assuming defense counsel had objected to the admissibility of the evidence, we find the State established it was more probable than not that the rock of cocaine identified by both agents and introduced into evidence is the one connected with the case. State v. Joseph, supra. Although there was some discrepancy as to whether the rock of cocaine was wrapped in plastic when it was purchased, the jury could have reasonably found that one of the agents was mistaken regarding the packaging of the cocaine when it was purchased.
As stated previously, once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to admissibility. Joseph, supra. Ultimately, a chain of custody or connexity of the physical evidence is a factual matter for determination by the jury. Id.
*552 In reaching the guilty verdict, the jury obviously found the State's witnesses to be credible, a determination which lies solely with the trier of fact. State v. Deruise, supra; State v. Hotoph, supra. Under the circumstances, we find that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant was guilty of distribution of cocaine.
For the foregoing reasons, we find no merit to defendant's assignments of error. The conviction is affirmed.
AFFIRMED.
NOTES
[1] In the same bill of information the State also charged Coris C. Addison, Terressa Armstrong and Meloney Tipado with Count 2, possession of cocaine, a violation of La.R.S. 40:967(C). In addition, defendant and Coris C. Addison were charged with Count 3, receiving stolen things valued at over $500, a violation of La.R.S. 14:69. On May 13, 2003, the State dismissed Counts 2 and 3 against defendant.
[2] The transcript of the habitual offender proceedings is not in the record. Defense counsel noted the omission, but did not request the transcript. Defendant does not challenge the multiple bill proceedings on this appeal. Neither the record nor the briefs indicate any appeal of the multiple bill proceedings.
[3] The record also establishes that defendant engaged in disruptive and/or inappropriate behavior in prior court appearances in this case. For example, during a February 26, 2003 hearing on a motion to suppress evidence, the trial judge told defendant to sit back in his chair. The trial judge stated that he had observed defendant interacting with some people in the audience. He admonished defendant not to allow that to happen again. He told defendant that he had a right to be there only as long as he followed the court's instructions. Later during the same hearing, the trial judge again admonished defendant to sit up in his chair.